(July 2, 1912.)

BELLEVUE STATE BANK, a Corporation, Appellant, v. H. N. COFFIN, Receiver of the IDAHO STATE BANK, a Corporation, Respondent.

[125 Pac. 816.]

BANKS—LOAN FROM ONE BANK TO ANOTHER—TRUST FUND — TRACING TRUST FUND—RIGHT TO RECOVER.

(Syllabus by the court.)

1. Where B. S. Bank pays H. S. Bank, upon solicitation of H. S. Bank, a sum of money to be used by the latter in the ordinary course of business, to be paid back in the future upon the latter bank receiving a shipment of money from another source, such payment of money is a loan, and such transaction creates the relation of debtor and creditor between such banks.

Points Decided.

2.   Where money is loaned by one bank to another upon false representations which amount to fraud upon the bank loaning the money, the contract of loan may be rescinded upon the ground of fraud, and such loan becomes a trust fund in the hands of the bank or its assignee, and like any other fund if it can be traced and is capable of identification it may be recovered from the assignee of the bank, and is a prior claim as against the general creditors.

3.   It is a well-known rule of equity that an owner of property who has been defrauded of the possession or ownership of the same may recover such property from the person who has secured it, and that the title of such property does not pass to the taker, but is held in trust, and that the owner has a superior right to such property as against the creditors of the taker; and where it has been used or converted by the taker, the owner of such property should also have a superior right to the value of the same whenever it can be recovered, without causing a reduction in the *pro rata* distribution of the remaining assets among creditors.

4.   Where it is shown that H. S. Bank borrows money from B. S. Bank upon false representations, and at a time when the H. S. Bank was insolvent, and used said money so borrowed in the ordinary course of business in paying checks, and the evidence fails to show that the estate of the bank was in any way bettered or augmented by reason of the application of such borrowed money, and in the absence of a showing that such money can be traced into specific property or money, such B. S. Bank cannot have its claim against the estate of H. S. Bank in the hands of the receiver declared a prior claim to other general creditors.

5.   Where an insolvent bank procures a loan from another bank upon false representations, and such money is to be used in the ordinary course of business of the insolvent bank, and the transaction results in nothing more than an exchange of creditors or the mere cancellation of one liability and the assumption of another, and the money is used in the discharge of an indebtedness, such facts alone are not sufficient to show that the assets of the bank borrowing such money have in any way been increased, or that there has been a betterment of the estate or its assets, or that such estate or its assets have in any way been improved or rendered more valuable.

(AILSHIE, J., dissents from opinion and affirms judgment on other grounds.)

'APPEAL from the District Court of the Fourth Judicial District for the County of Blaine.   Hon. Edward A. Walters, Judge.

An action to recover upon a debt and have it declared a prior and preferred claim against the assets of an insolvent bank in the hands of a receiver. *Affirmed.*

Richards & Haga, for Appellant.

A constructive trust or trust *ex maleficio* arises by implication of law where one party, by fraud and misrepresentation, obtains something of value from another. (Perry on Trusts and Trustees, 6th ed., sec. 171; Pomeroy's Eq. Jur., 3d ed., sec. 155; *Wasson v. Hawkins,* 59 Fed. 233.)

The relation of trustee and *cestui que trust* is not that of debtor and creditor. (*Cragie v. Hadley,* 99 N. Y. 131, 52 Am. Rep. 9, 1 N. E. 537.)

Trust funds may be followed into the trustee's estate although no particular property or asset can be identified as having been purchased or acquired by the particular funds. (*State v. Bruce,* 17 Ida. 1, 134 Am. St. 245, 102 Pac. 831; *First Nat. Bank v. Bunting & Co.,* 7 Ida. 27, 59 Pac. 929, 1106; *State v. Thum,* 6 Ida. 323, 55 Pac. 858; *Myers v. Board of Education,* 51 Kan. 87, 37 Am. St. 263, 32 Pac. 658; *Kansas State Bank v. First State Bank,* 62 Kan. 788, 64 Pac. 634.)

Sullivan & Sullivan, for Respondent.

When money is deposited in a bank without any understanding that the identical money shall be returned, but that only a like sum of lawful money shall be repaid, the deposit is general, the bank is permitted to use the money in its business, and the relation of debtor and creditor is created by the transaction. (*Mut. Acct. Assn. v. Jacobs,* 141 Ill. 261, 33 Am. St. 302, 31 N. E. 414, 16 L. R. A. 516; *Leaphart v. Com. Bank,* 45 S. C. 563, 55 Am. St. 800, 23 S. E. 939, 33 L. R. A. 700.)

There is no difference in principle in the case at bar, where currency or other money is loaned or advanced by one bank to another which is insolvent for use in the borrowing bank, and in a case where a depositor leaves his money with the bank a short time before it suspends. (*Corn etc. Bank v. Solicitors etc. Co.,* 188 Pa. 330, 68 Am. St. 873, 41 Atl. 536.)

A deposit or loan of money in the ordinary course of business, when the bank is insolvent with knowledge of its officers, passes title, and the relation of debtor and creditor arises, subject, however, to be reclaimed, and the transaction rescinded by reason of the fraud, if the funds can be traced or identified, either in their original or substituted form. If the funds can thus be followed and identified, the bank becomes a trustee *ex maleficio.* (1 Bolles' Mod. Law of Banking, p. 188; *Plano Mfg. Co. v. Auld,* 86 Am. St. 794, notes; *Richardson v. N. O. Co.,* 102 Fed. 780, 42 C. C. A. 619, 52 L. R. A. 67; *Corn Bank v. Trust Co.,* 18 Pa. 330, 68 Am. St. 872, 41 Atl. 536; *Wasson v. Hawkins,* 59 Fed. 233; *Quin v. Earl,* 95 Fed. 728; *Bayor v. Am. T. & S. Bk.,* 157 Ill. 62, 41 N. E. 622; *Willoughby v. Weinberger,* 15 Okl. 226, 79 Pac. 777; *Blake v. St. Sav. Bk.,* 12 Wash. 619, 41 Pac. 909.)

Must trace and identify trust funds to obtain a preference. (1 Bolles' Mod. Law of Banking, 188 et seq.; *Lowe v. Jones,* 192 Mass. 94, 116 Am. St. 225, 78 N. E. 406, 6 L. R. A., N. S., 487, 7 Am. & Eng. Ann. Cas. 553; *Plano Mfg. Co. v. Auld,* 86 Am. St. 775; *Cherry v. Territory,* 17 Okl. 221, 89 Pac. 192, 8 L. R. A., N. S., 1254; Morse on Banks and Banking, 629; *Crawford Co. v. Strawn,* 157 Fed. 49, 84 C. C. A. 553, 15 L. R. A., N. S., 1100; 5 Cyc. 568, 622; 3 Am. & Eng. Ency. of Law, 847, 848, note 4; *Burnham v. Barth,* 89 Wis. 362, 62 N. W. 96; *Cavin v. Gleason,* 105 N. Y. 256, 11 N. E. 504; *State v. Foster,* 38 Pac. 926; *Byrne v. Byrne,* 113 Cal. 294, 45 Pac. 536; *Shute v. Hinman,* 34 Or. 578, 56 Pac. 412, 58 Pac. 882, 47 L. R. A. 265; *In re McIntyre & Co.,* 185 Fed. 96, 108 C. C. A. 543; *Spokane Co. v. Bank,* 68 Fed. 979, 16 C. C. A. 81; *Litchfield v. Ballou,* 14 U. S. 190, 5 Sup. Ct. 820, 29 L. ed. 132; *Little v. Chadwick,* 151 Mass. 109, 23 N. E. 1005, 7 L. R. A. 570.)

False representations of cashier of bank not sufficient to create trust and give preference. (*Venner v. Cox* (Tenn. Ch.), 35 S. W. 769.)

It is not a fraud that gives a priority. (*Quin v. Earle,* 95 Fed. 731.)

Payment of debts is not augmentation of assets. (*Slater v. Oriental Mills,* 18 R. I. 352, 27 Atl. 443; *Monatuck Silk Co. v.*

*Flanders,* 87 Wis. 237, 58 N. W. 385; *City of Lincoln v. Morrison,* 64 Neb. 822, 90 N. W. 908, 57 L. R. A. 885; *Spokane Co. v. First Nat. Bank* (Wash.), 68 Fed. 979, 16 C. C. A. 81; *Jones v. Chesebrough,* 105 Iowa, 303, 75 N. W. 100; *Insurance Co. v. Caldwell,* 59 Kan. 156, 52 Pac. 440; *Kan. St. Bank v. First St. Bank,* 62 Kan. 788, 64 Pac. 636; *Pearson v. Haydel,* 90 Mo. App. 253; *Bircher v. Walther,* 163 Mo. 461, 63 S. W. 691; *Mult. Co. v. Or. Nat. Bank,* 61 Fed. 914; *Willoughby v. Weinberger,* 15 Okl. 226, 79 Pac. 777; *B. M. W. Co. v. P. P. M. Co.,* 187 Fed. 590, 109 C. C. A. 420; *Ferchen v. Arndt,* 26 Or. 121, 46 Am. St. 603, 37 Pac. 161, 29 L. R. A. 664.)

STEWART, C. J.—On August 25, 1910, Leo Cramer, president and representative of the Idaho State Bank, a banking corporation organized under the laws of the state of Idaho and doing business at Hailey, Idaho, called upon the Bellevue State Bank at Bellevue, Idaho, and informed C. W. Wilson, cashier of said bank, that the Idaho State Bank had a shipment of $5,000, which shipment should have arrived on the train reaching Hailey on that day, and by reason of such shipment not arriving, the Idaho State Bank was in need of $2,500 in currency for temporary use until said shipment should arrive, which should be on the following day, and that said Idaho State Bank would upon the arrival of said shipment return said $2,500. Upon this statement the Bellevue State Bank, through its cashier, C. W. Wilson, turned over to Leo Cramer, for the use of the Idaho State Bank, $2,500 in currency. This currency was placed in the Idaho State Bank and used by said bank in the ordinary course of business until the 31st day of August, 1910, when the bank was closed and a receiver appointed therefor. This currency was used with other cash for the purpose of paying checks drawn by depositors, and when the receiver took charge of the bank there was in the bank $643.75, of which $85.00 was in currency, and no part of which could be identified as a part of the $2,500 obtained by the Idaho State Bank from the Bellevue State Bank.

After the bank failed on the 31st day of August, 1910, H. N. Coffin, the respondent, was appointed receiver of the Idaho

State Bank, and this action was brought demanding that the $2,500 obtained by the Idaho State Bank from the Bellevue State Bank be decreed a trust fund and that the claim of the appellant be decreed to be prior to the claims of all the general creditors and claimants of the Idaho State Bank.

The cause was tried to the court, and the court found the facts substantially as stated herein.   From this state of facts the court found as a conclusion of law the following:

"1. That said Bellevue State Bank did not become, nor is it now, a prior or preferred creditor of said Idaho State Bank in said sum of $2,500 or any part thereof, over or above any of the other claimants or depositors, or the creditors of said bank.

"2. That the defendant is entitled to a judgment for his costs and disbursements herein."

Judgment was entered for defendant.   From this judgment this appeal is taken.

The only question assigned as error and urged upon this appeal is, the conclusion of law, that the money received from the Bellevue State Bank by the Idaho State Bank did not constitute a trust fund to be repaid to appellant in preference to the depositors and general creditors of said bank.

It is the contention of appellant that the currency or fund which was delivered by the Bellevue State Bank to the Idaho State Bank never at any time became the property of the Idaho State Bank, and that no title ever passed from the Bellevue State Bank to the Idaho State Bank, and that the relation of debtor and creditor did not and never existed by reason of the procurement of said currency or fund through false representations which amounted to a fraud.   While the respondent contends that upon the payment of the $2,500 by the Bellevue State Bank to the Idaho State Bank under the agreement as shown by the facts in this case, there immediately arose between the Idaho State Bank and the Bellevue State Bank the relation of debtor and creditor, and by reason of such relation no superior or better right was vested in the Bellevue State Bank to the assets of the Idaho State Bank than that of other general creditors of said bank.

We think it is a general principle of law that a general deposit of money with a bank transfers the title of the money so deposited from the depositor to the bank, and creates the relation of debtor and creditor between the bank and the depositor. (Notes to *Plano Mfg. Co. v. Auld,* 86 Am. St. 777.) When money is paid by one bank to another bank to be used by the latter in the ordinary course of business, to be paid back in the future upon the latter bank receiving a shipment of money from another source, as shown by the facts in this case, there can be no reason why the same rule of law does not apply. The transaction is certainly the equivalent to a deposit in so far as creating the relation of debtor and creditor. It is a money loan or a payment by the Bellevue State Bank to the Idaho State Bank upon a promise to repay, not with the same money but with other funds, an equal amount at a future date. This certainly creates the relation of debtor and creditor. In this case, by the payment of the money, the title passed to the Idaho State Bank and became its property, and was dealt with as it saw fit, and was used in its ordinary course of business in paying debts and depositors, and that was the purpose for which the fund was to be used at the time the same was secured, and it specifically created the relation of debtor and creditor.

In the case of *Mutual Acc. Assn. v. Jacobs,* 141 Ill. 261, 33 Am. St. 302, 31 N. E. 414, 16 L. R. A. 516, the supreme court of Illinois says: "Where money is deposited in a bank without any understanding that the identical money shall be returned, but only that a like sum of lawful money shall be repaid, the deposit is general, the bank is permitted to use the money in its business, and the relation of debtor and creditor is created by the transaction."

In the case of *Leaphart v. Com. Bank,* 45 S. C. 463, 55 Am. St. 800, 23 S. E. 939, 33 L. R. A. 700, the supreme court of South Carolina says: "A deposit of money made with a bank corporation, or association, to be used by it for the purpose of making profit therefrom, with an agreement on its part to repay the amount with interest, becomes at once the property

of the depositee, and creates at once the relation of debtor and creditor between the depositee and depositor, with nothing in the nature of a trust or fiduciary character in or growing out of the transaction.''

There is no difference in principle between the case at bar, where currency or other money is loaned or advanced by one bank to another which is insolvent for use in the borrowing bank, and a case where a depositor leaves his money with the bank a short time before it suspends. (*Corn etc. Bank v. Solicitors etc. Co.*, 188 Pa. 330, 68 Am. St. 873, 41 Atl. 536.)

While this rule is well recognized by the authorities, there is another principle of law which is equally well settled, and that is: That the receipt of deposits by a bank known to be insolvent by its officers is a fraud upon the depositor, and renders the bank or its assignees trustees *ex maleficio*, and the deposit is a trust fund recoverable by the depositor. In such cases the title does not pass to the bank, but it takes title through fraud and by contract voidable for that reason at the election of the depositor. ''The keeping the bank open, and the conducting of its business in the usual manner, constitutes a representation to its customers of the solvency of the bank upon which they had a right to rely; and if the bank was known to be insolvent by the officers who were charged with its management, the concealment of that fact from a person about to make a deposit would constitute a fraud upon him. It is upon this ground, and not upon the theory that the bank does not take title to such deposit, that such deposits are uniformly held recoverable by the depositor.'' (Notes to *Plano Mfg. Co. v. Auld*, 86 Am. St. 794.)

The above citation contains a collection of the leading cases upon this question, and renders it unnecessary to cite in this opinion all of such cases. We, however, refer to Perry on Trusts and Trustees, 6th ed., sec. 171; Pomeroy's Equitable Jurisprudence, 3d ed., sec. 155.

In the case of *Blake v. State Sav. Bank*, 12 Wash. 619, 41 Pac. 909, the supreme court of Washington quotes with approval from *Craigie v. Hadley*, 99 N. Y. 131, 52 Am. Rep.

9, 1 N. E. 537, as follows: "The bank acquires title to the money, drafts, or checks on an implied agreement to pay an equivalent consideration when called upon by the depositor in the usual course of business. The further rule that one who has been induced to part with his property by the fraud of another, under guise of a contract, may, upon discovery of the fraud, rescind the contract, and reclaim the property, unless it has come to the possession of a *bona fide* holder, is equally well settled, and does not at all depend upon the character of the wrongdoer, whether a corporation or a natural person. . . . . The right to a restoration in such case may be defeated by the acts or acquiescence of the defrauded party, or because the property has lost its identity and cannot be traced, or other persons have innocently acquired interests in ignorance of the fraud." And the court concludes: "It will be seen from this quotation from that case that what the court really decided was that the reception of deposits by a bank under the circumstances stated was such a fraud upon the depositor as gave him a right to rescind the contract of deposit, and reclaim the drafts or their proceeds, which, in that case, were easily distinguishable from the other assets of the bank. The conclusion of the court would no doubt have been different if the money had 'lost its identity,' and could not be traced."

In *Corn etc. Bank v. Solicitors etc. Co.,* 188 Pa. 330, 68 Am. St. 873, 41 Atl. 537, the supreme court of Pennsylvania says: "The trust company was insolvent . . . . when the transaction took place and it received the plaintiff's money, and the officers of the company were aware of its condition. Keeping its doors open on that day was, whether unintentional or not, a representation to the public of solvency. Whether they still hoped on that day by some means to recuperate and avoid closing is not material; the fact of insolvency on that day remained. There is no difference in principle between this transaction and that of a depositor who leaves his money with the bank a few hours before it suspends. The acceptance of the money under such circumstances is a fraud upon the depositor, and if it has not been used or mixed with the common funds and can be identified, he can maintain replevin for it."

In *Wasson v. Hawkins,* 59 Fed. 233, Justice Baker discusses a similar question, and holds that the title acquired by the bank to the money and checks deposited under such circumstances would be voidable at the election of the depositor, who could bring suit to recover his deposit without any previous demand.   The bank would become a trustee *ex maleficio* and would hold the deposit for the use of the depositor subject to his right of reclamation.

We do not think it necessary to quote any further decisions upon this subject, for we are satisfied that the rule is, that where money is deposited in an insolvent bank known by its officers to be hopelessly insolvent, or money loaned by one bank to another bank upon false representations which amount to fraud to the bank loaning the money, the contract may be rescinded upon the ground of fraud, and such deposit becomes a trust fund in the hands of the receiver of the bank, and like any other fund, if it can be traced and is capable of identification, it may be recovered from the assignee of the bank and is a prior claim as against general creditors.   (86 Am. St. 794, 800, 801, note.)

The question then arises: Was there actual fraud, effectuated by the acts and representations of Cramer upon behalf of the Idaho State Bank in procuring the money from the Bellevue State Bank?   Am. & Eng. Ency. of Law, vol. 14, p. 21, defines actual fraud as follows: ''Actual fraud is where a person intentionally deceives another by words or conduct for the purpose of inducing him to part with property or to surrender some legal right and thereby accomplish his purpose.   It involves the element of dishonesty of purpose or evil design. This is the first class of fraud in Lord Hardwicke's classification above referred to.''

In the case of *Barnes v. Crawford,* 115 N. C. 76, 20 S. E. 386, the court quotes from Webster as follows: ''An intentional perversion of the truth for the purpose of obtaining some valuable thing or promise from another.''   Many other definitions of fraud may be found in Words and Phrases, vol. 3, p. 2943.

In the light of the above definition of fraud it is apparent that the money loaned to the Idaho State Bank by the Bellevue State Bank was procured upon false representations made by Cramer to Wilson. The representation made by Cramer that the Idaho State Bank was short in cash was certainly true at the time it was made, but the representation that a shipment of currency was expected and did not arrive, and that it would arrive, and upon arriving the amount advanced by the Bellevue State Bank to the Idaho State Bank would be returned, was absolutely false and based upon no facts whatever, and certainly was the inducement which lead Wilson to advance the money to Cramer. Because it was so procured such fund became a trust fund in the hands of the bank, and such trust fund may be recovered from the receiver of the bank if it can be traced and is capable of identification. The right to recover, therefore, in this case is upon the ground that the representations made by Cramer to Wilson upon which the fund was secured constituted a fraud upon the Bellevue State Bank, and not upon the ground that the bank did not take title to such property.

It is a well-known rule of equity that the owner of property who has been defrauded of the possession and ownership of such property may recover the same from the person who has secured such property, and that the title of such property does not pass to the taker but is held in trust, and that the owner has a superior right to such property as against the creditors of the taker; and where it has been used or converted by the taker, the owner of such property should also have a superior right to the value of the same whenever it can be recovered without causing a reduction in the *pro rata* distribution of the remaining assets among creditors.

In the case of *Frelinghuysen v. Nugent*, 36 Fed. 239, Judge Bradley, of the federal court, states the rule as to the right to recover trust funds or property as follows: "Formerly the equitable right of following misapplied money or other property into the hands of the parties receiving it depended upon the ability of identifying it; the equity attaching only to the very property misapplied. This right was first extended

to the proceeds of the property, namely, to that which was procured in place of it by exchange, purchase, or sale. But if it became confused with other property of the same kind, so as not to be distinguishable, without any fault on the part of the possessor, the equity was lost. Finally, however, it has been held as the better doctrine that confusion does not destroy the equity entirely, but converts it into a charge upon the entire mass, giving to the party injured by the unlawful diversion a priority of right over the other creditors of the possessor. This is as far as the rule has been carried.''

It would be useless to attempt to distinguish and apply the different decisions of the courts in cases where the owner of property or money, which has passed into the possession of another through misrepresentation and fraud, attempts to recover such property or money, and how far the owner is required to go in showing the identity of the property or money, and impose upon it the character of a trust, for the reason that the rule announced in these cases is controlled wholly by the particular facts and circumstances of each case, and the various cases relating to this subject show the distinction made by the courts and the rules declared in the various classes. Many cases are collated in the notes to the case of *Lowe v. Jones,* 192 Mass. 94, 116 Am. St. 225, 78 N. E. 402, 6 L. R. A., N. S., 487, and annotated in 7 Am. & Eng. Ann. Cas., p. 558, and also in the notes to the case of *Plano Mfg. Co. v. Auld,* 86 Am. St. 769.

An examination of these various cases leads us to believe that the true rule governing the particular facts of this case is, that if the transaction results in nothing more than an exchange of creditors or the mere cancellation of one liability and the assumption of another, or if the money was used in the discharge of an indebtedness, such facts alone are not sufficient to show that the assets of the trustee or its assignee have been increased by such transaction, and therefore there has been no betterment of the estate and such assets have not been improved or rendered more valuable and are in no way impressed with the trust. (*Insurance Co. v. Caldwell,* 59 Kan. 156, 52 Pac. 440; *Bradley v. Chesebrough,* 111 Iowa,

126, 82 N. W. 472; *District Township of Eureka v. Farmers' Bank,* 88 Iowa, 194, 55 N. W. 342; *Moore v. Chesebrough* (Iowa), 81 N. W. 469; *Kansas State Bank v. First State Bank,* 9 Kan. App. 839, 61 Pac. 868; *Sunderlin v. Mecosta County Sav. Bank,* 116 Mich. 281, 74 N. W. 478; *Sherwood v. Milford Bank,* 94 Mich. 78, 53 N. W. 923; *In re Seven Corners Bank,* 58 Minn. 5, 59 N. W. 833; *Midland Nat. Bank v. Brightwell,* 148 Mo. 358, 71 Am. St. 608, 49 S. W. 994; *Frank v. Bingham,* 58 Hun, 580, 12 N. Y. Supp. 767; *Freiberg v. Stoddard,* 161 Pa. 259, 28 Atl. 1111; *Continental Nat. Bank v. Weems,* 69 Tex. 489, 5 Am. St. 85, 6 S. W. 802; *Nonotuck Silk Co. v. Flanders,* 87 Wis. 237, 58 N. W. 383 (overruling *McLeod v. Evans,* 66 Wis. 401, 57 Am. Rep. 287, 28 N. W. 173, 314); *Thuemmler v. Barth,* 89 Wis. 381, 62 N. W. 94; *Dowie v. Humphrey,* 91 Wis. 98, 64 N. W. 315; *City Bank of Hopkinsville v. Blackmore,* 75 Fed. 771, 21 C. C. A. 514; *Beard v. Independent District of Pella City,* 88 Fed. 375, 31 C. C. A. 562; *Lowe v. Jones,* 192 Mass. 94, 116 Am. St. 225, 78 N. E. 406, 6 L. R. A., N. S., 487; 7 Am. & Eng. Ann. Cas. 554; 5 Thompson's Corporations, 1st ed., sec. 7103; *Burnham v. Barth,* 89 Wis. 362, 62 N. W. 96; *Cavin v. Gleason,* 105 N. Y. 256, 11 N. E. 504; *Byrne v. Byrne,* 113 Cal. 294, 45 Pac. 536; *Shute v. Hinman,* 34 Or. 578, 56 Pac. 412, 47 L. R. A. 265; *Board v. Strawn,* 157 Fed. 49, 15 L. R. A., N. S., 1100, 84 C. C. A. 553; *Bayor v. Am. Trust & Sav. Bank,* 157 Ill. 62, 41 N. E. 622; *Little v. Chadwick,* 151 Mass. 109, 23 N. E. 1005, 7 L. R. A. 570.)

From an examination of the authorities applicable to the facts of this case we think the safe and proper rule of law to apply to such facts is that when a bank secures a deposit or borrows money from another bank and procures such deposit or loan upon false representations which amount to fraud, and such money is confused with other currency in the possession of the bank borrowing such currency, and such mingled currency is all disposed of by the bank in the discharge of debts and in the ordinary course of business of said bank, and the bank is insolvent and goes into the hands of a receiver, that the depositor or person who loans the cur-

rency cannot recover the same or the value thereof out of the assets, such as real estate owned by the bank at the time of the failure, or from money collected by the receiver on notes in the bank.

In the cases where it is held that a recovery can be had, to be paid from the entire assets of the insolvent bank, it is also held that there must be some identification of either the same property or of particular property or money on hand into which the particular money was converted, or to secure which said money was commingled with other money or property in securing such money or property, and in such cases a recovery is allowed out of the money or property so secured.

Counsel for appellant in this case base their claim on the principles announced by this court in the cases of *State v. Thum,* 6 Ida. 323, 55 Pac. 858, *First Nat. Bank v. Bunting & Co.,* 7 Ida. 27, 59 Pac. 929, 1106, and *State v. Bruce,* 17 Ida. 1, 134 Am. St. 245, 102 Pac. 831. Those cases were dealing with the question of recovery upon a claim made for public money deposited in a bank that became insolvent. Those cases in no way discussed the right of a private person to recover money deposited in a bank or loaned to a bank, even though such deposit was made or loan procured by fraud, and by reason of which the fund loaned or deposited became a trust fund.

In *State v. Thum,* this court said: "Public money deposited by a public officer in a bank becomes a trust fund, and not part of the estate of the bank, and in case of the insolvency of the bank, its receiver must treat such fund as the property of the true owner, and not of the bank"; and found "the position of the state in this case is unlike that of an ordinary depositor in a bank." There was no discussion in that case with reference to tracing the fund.

In the case of *First Nat. Bank v. Bunting* the deposit was of public funds and made by a public officer, and it was held in that case that the deposit was a special deposit under the laws of the state. The question of identification of the fund was in no way discussed by the court. So in neither one of these cases did this court enter into or announce any rule

which should govern the right to recover from a bank a sum of money deposited at the time the bank was insolvent, and that such recovery could be had out of the general assets of the estate as against other creditors against such bank.

In the case of *State v. Bruce,* 17 Ida. 1, 134 Am. St. 245, 102 Pac. 831, this court had under consideration a claim and lien made by the state for a prior claim and lien upon the assets of a bank upon deposits made by the state treasurer. The court held that the money deposited by the state treasurer was the property of the state and that the bank knew that fact at all times it was dealing with the fund, and notwithstanding the fact that the fund deposited went into the general funds of the bank and was paid out from day to day together with the general deposits upon the checks, still the lien should be attached to the general assets of the bank.

In that discussion, however, the court was speaking with reference to money deposited in the bank without authority of law, and under such circumstances the money so deposited could in no way become a part of the general assets of the bank, and the bank accepted and held such money as a special deposit and as a trustee of such fund, and in such case the fund could not become a part of the general assets of the concern, even though the state was unable to identify the particular fund in any particular kind of money or property of said bank. The rule announced in that case was with reference to the particular kind of deposit made in that case, and it was not necessary for the court to announce a general principle which would bind a depositor or person loaning money to an insolvent bank in a contest where the general creditors' rights were called in question and affected, as in the present case. The statement made, "We fail to see what difference it can make in point of fact, reason or law whether the money was used in buying bonds, mortgages and other paper to add to the general assets of the bank, or in discharging the debts of the bank. In either event, it adds to or appreciates the body and value of the bank's assets. If the money is used to-day to pay the bank's debts and it sus-

pends business to-morrow, the indebtedness of the bank to-morrow will be just as much less than it would otherwise have been as the amount paid out represents,'' was based upon the authority of *Meyer v. Board of Education,* 51 Kan. 87, 37 Am. St. 263, 32 Pac. 658, and cases referred to in that case.

We are inclined to think, however, that this rule is a little too broad to be applied to the facts involved in this case, and that it should be limited to the extent referred to above in this discussion, and under the rule as announced in the cases heretofore cited.

We think the correct rule is stated in *Insurance Co. v. Caldwell,* 59 Kan. 156, 52 Pac. 440, as follows: ''The fund itself, or something into which it has gone, and which stands as its representative, must be on hand, subject to identification, and separable from the general assets, in order to charge the assignee with the trust; or, if the fund has been so commingled with the general assets as to be incapable of identification or tracing, the estate which came to the assignee must have been augmented or bettered in an appreciable and tangible way, in order to charge it with the trust. The mere saving of the estate, by the discharge of general indebtedness otherwise payable out of it, or the payment of the current expenses of the business, is not an augmentation or betterment of the estate, within the meaning of the rule. If the estate has not been increased by specific additions to it, or if what previously existed has not been improved or rendered more valuable, it has not been impressed with the trust claimed.''

Applying this rule to the facts of this case, it is clear that the money received by the appellant from the respondent in no way increased the assets of the Idaho State Bank by specific additions, or improved or rendered more valuable the assets of said bank or augmented or bettered the assets. The mere fact that the money paid debts or other obligations of the bank, and thereby decreased its indebtedness, was beneficial to the creditors, for the reason that the assets would not have to be reduced in paying such debts, and thereby reduce the share that would go to each of the creditors, is

not an answer to this question, for at the time such checks were cashed and such money was dispersed the bank was insolvent and the persons who received such money upon such checks in payment of such debts received the full amount of their claims to the extent of payment, while the other general creditors will not be able to receive proportionately such full payment when their claims are paid, and thereby are injured by reason of such fund being so dissipated.

The assumption included within the statement made by this court in the Bruce case, that because the trust fund was used in the payment of indebtedness of the bank and in the ordinary course of business that the estate of the bank was augmented and bettered, without a showing that such money can be traced into any specific property or money, is not justified by the facts shown in this case, and neither did the court so find. In fact, in the present case there is no proof and no finding to the effect that the estate of the bank was in any way bettered or augmented by reason of the application of the trust fund; and because of that we think the judgment should be *affirmed.* Costs awarded to respondent.

Davis, District Judge, concurs.

AILSHIE, J., Dissenting from Opinion and Affirming Judgment on Other Grounds.—I am not able to agree with the views which seem to be entertained by the Chief Justice with reference to this case. The facts of the case are quite simple; indeed, the evidence is very brief. In order, therefore, to make clear the conclusion I reach on the question of the trust relation sought to be established, I will quote at length from the evidence of the cashier of the appellant bank (and his evidence is not disputed and covers the whole transaction). After the formal questions and answers his testimony is as follows:

"Q. What took place there between you and Mr. Cramer? A. Mr. Cramer came to me and said that he had shipped out about $4;000 to Ketchum to Thomas Reed and it had left him a little short, and that he had a shipment on the road and

needed a little money until his shipment came in.    Q. How much of a shipment did he state?    A. He said it was on the road at that time and would—    Q. How much of a shipment?    A. $5,000.    Q. And did he say in what form?    A. He said it was a shipment of currency.    Q. What did he state he would do?    A. He said that if I would let him have some money he would return it in currency when his shipment came in.    Q. And did you let him have the currency?    A. Yes, sir.    Q. How much did you let him have?    A. $2,500. Q. And when did you see him again?    A. I do not think it was until the 31st of August.    Q. When did you call at the defendant's bank, if at all, after the 25th?    A. On August 29th.    Q. And whom did you meet there?    A. Mr. Cutts, Mr. Cramer was not there.    Q. And what took place?    A. I asked him if he could return the $2,500 and he said that he could not, that the shipment had not arrived, but he thought it would be in on the evening train.    Q. What position did he hold with that bank?    A. He was the assistant cashier, I believe.    Q. When next did you go again, if at all? A. The next day I called at the bank again.    Q. And who did you see?    A. I saw Mr. Cutts again.    Q. And what took place on that occasion?    A. He told me that the shipment had not come yet, but he was sure that it would be in on the 30th on the train.    Q. And did you go there again, if at all? A. On the 31st.    Q. And who did you see?    A. I went in to see Cutts and I asked if Cramer was there—    Q. And what else did you say?    A. I asked for Cramer and he was out and I waited two or three hours for him and finally came and went back into the back room, and I asked him if I could see him a few minutes, and he said, 'Yes, sir, in a few minutes,' and he never came back out at all."

On cross-examination the same witness testified that after making this loan to Cramer he did not communicate with Cramer or the Idaho State Bank or have any word from them until the 31st day of August, the day on which the Idaho State Bank failed.    He also testified on cross-examination:

"Q. When were you to receive this money back?    A. It was to be returned as soon as the shipment of money came in.

Q. Was it to be brought down to you the next day? A. I do not think so. I do not think there was any arrangement of that kind. Q. There was no arrangement of that kind made at the time when he got the money and told you he had a shipment coming in that would be there on the 25th or 26th? A. No, sir, I do not think so."

In other words, the witness admits that there was no definite understanding as to just when and how the payment should be made, whether it should be brought down to the bank by Cramer or an officer of the bank in currency, or whether it should be sent to the bank by remittance in the ordinary and due course of banking business, or an officer of the Bellevue Bank was to call at the Idaho State Bank and get the money. I recite the foregoing for the purpose only of illustrating the fact that this was an ordinary loan made by the Bellevue State Bank to the Idaho State Bank, and that it was made under no other or different arrangements or conditions from any other ordinary loan. It is admitted by all parties that this was in fact a mere loan from the one bank to the other and that the relation of debtor and creditor immediately arose. (*Leapheart v. Commercial Bank,* 45 S. C. 563, 55 Am. St. 800, 23 S. E. 939, 33 L. R. A. 700; *Mutual Acc. Assn. v. Jacobs,* 141 Ill. 261, 33 Am. St. 302, 31 N. E. 414, 16 L. R. A. 516.) It is contended, however, that in some fictitious and imaginary way the relation of debtor and creditor, which is clearly established, was subsequently and after the money was all paid out and expended by the Idaho State Bank converted into a trust relation, and that the Idaho State Bank, *after it had expended this money,* became a trustee for the Bellevue State Bank, its *cestui que trust.* I am wholly unable to agree with this contention, and shall briefly state my reasons for my disagreement.

It is a well-established rule of law that where one parts with the possession of his property by reason of fraud practiced by the one who procures the property, upon discovering the fraud he may rescind the contract and pursue his property and recover the same, unless it has passed into the hands of an innocent purchaser. (*Corn etc. Bank v. Solicitors' Loan*

*& Trust Co.,* 188 Pa. 330, 68 Am. St. 872, 41 Atl. 536; *Far-ber v. Stephens,* 35 Fed. 17.)   Strictly speaking, the right to pursue property in such cases rests upon the doctrine of rescission of contracts rather than that of trust and trus-tee.   (1 Perry on Trusts, sec. 166.)   The principle upon which the recovery is allowed is the same both at law and in equity.   The misrepresentation or fraud which entitles the party to rescind the contract and pursue the property must consist in some fact *material to the contract* or of some-thing that *goes to the essence of the contract* itself.   (1 Perry on Trusts, sec. 174.)

Courts of equity are constituted for the purpose of doing substantial justice between the parties, but this must be admin-istered under some recognized system and standard, for the reason that individuals in the same society differ in their views of absolute right and justice and of moral standards as well. This principle is tersely enunciated by Perry on Trusts, at sec. 173, where he says:

"There are in every community two classes of rights,—per-fect rights, and imperfect rights.   Perfect rights are those that may be enforced, or for the breach of which damages may be recovered; imperfect rights are those which are conceded to every man, but which cannot be enforced by human tribunals, and for the breach of which no damages can be recovered. Thus every man has a right to the utmost good faith, and the most perfect frankness and truthfulness in all the transactions of business; but courts of justice would be utterly powerless to enforce such a standard of morality.   They would have neither the time nor the means of investigating the innumerable arts of buyers and sellers.   And so courts have been obliged to lay down certain practical rules and limitations upon the subject of misrepresentation."

No court of equity would undertake to interfere with and rescind the transactions of men simply because there has been a breach of the moral or ethical standard generally recognized by men, or because someone has promised to do a certain thing or meet an obligation or transact certain business, and has failed to do so, either at the time or in the manner represented.

If courts were to undertake this thing, they would be over-whelmed and swamped with business. Every case of this kind must be considered in the light of its own peculiar facts and circumstances and be decided on such clear and unmistakable principles of equity as are generally recognized and conceded to be both civilly and morally binding on men in their dealings with each other. It is never equity or justice to restore a negligent person, or one who has failed to exercise reasonable care and precaution, to a right at the expense of innocent third parties.

Now, turning to the undisputed facts of this transaction, let us inquire as to whether the transaction bears any of the earmarks of a trust, and if not, whether there was any such fraud practiced as went to the *essence and consideration of the contract* so as to convert the transaction into a constructive trust. In the first place, the parties dealt at arms'-length. They sustained no confidential relation toward each other. The Bellevue State Bank was not a depositor of the Idaho State Bank and was not dealing with the bank upon the same theory that a depositor deals with a bank. The Bellevue State Bank was notified at the time Cramer procured this loan that the Idaho State Bank was short of funds, and that Cramer considered it necessary and essential that he procure this sum of $2,500 in order to continue to do business and meet the current demands on the bank. The loan was made upon the promise of Cramer that the bank would repay the sum within a day or two, or upon the Idaho State Bank receiving a sum of $5,000 in currency which was then supposed to be on the way from *somewhere* not disclosed. In the meanwhile the officers of the bank making the loan had notice that the money was to be immediately expended in meeting the demands of the bank. This money was not delivered to Cramer for the purpose of being applied to the use and benefit of the Bellevue State Bank, but rather to be used and applied as the money and property of the Idaho State Bank. It is said, however, that the fraud and deception in this case consisted in the representation of Cramer that he had a $5,000 shipment of currency on the way that would reach Hailey on that day or

the following day, and that this loan should be paid out of that sum. Let us see if this was the *essential ingredient* of the contract and the moving consideration for the loan. *If the officers of the Bellevue bank would not take Cramer's promise that he would repay this loan or would not trust his word of mouth, then certainly they would have no more reason to trust his representation that he had a shipment of currency on the way, out of which he would make the payment.* If he had made a naked promise, as he did, on which he received this loan, without giving any security or even any evidence of the indebtedness, it might be said that there was no other tangible proof he could have then offered to show that he meant what he said. If they could not rely on his promise to pay, then why rely on his statement about this shipment? But when he told them that he had a shipment of $5,000 currency on the way, they might have asked him for the evidence of that fact. If his statement was true that he did have a shipment on the way, he must have had written evidence either by way of letter or telegram which would have constituted proof that what he said was true. They never even asked for any such evidence or proof; they relied on his word in this respect as much as they did with reference to the promise to pay. I recite this merely for the purpose of showing that they undoubtedly made the loan upon the faith of Cramer's promise to repay the loan rather than upon the specific representation that he had $5,000 coming. The promise to pay was the real essence of the consideration and contract. The other representation was simply an additional inducement. The subsequent action of the officers of the Bellevue State Bank demonstrates that this was absolutely true, because they never made any demand for the money or took any steps to procure the payment until the 31st, whereas it is proven that Cramer represented that the $5,000 shipment would be received not later than the 26th, the following day after the loan was made. These facts demonstrate conclusively to my mind that this was an ordinary loan, and that it was no more induced upon the representation that Cramer had a shipment of $5,000 in currency coming than it was

induced upon his standing as a banker and business man and
his mere promise to pay the debt. No method was pointed
out or provided for in that agreement whereby the Bellevue
bank should be able to lay hold upon or receive the sum of
$2,500 out of this specific shipment in any other mode or
manner than by the officers of the Hailey bank bringing it or
sending it to the Bellevue bank, and it would evidently have
made no difference to the Bellevue bank whether it came out
of that shipment or from money received from general deposi-
tors. It was a mere trade or commercial transaction.

Another thing in this case which ought to receive serious
consideration is the fact that the Bellevue bank at the time
of making this loan was placed in possession of such facts by
Cramer as to put a reasonably prudent and diligent man on
inquiry as to the solvency of the Hailey bank, and this was
such notice and information as would have undoubtedly *pre-
cluded any ordinary business man depositing that sum in the
bank at that time on a general deposit.* Suppose a general
depositor going to the bank had been at the time notified that
the bank was so close run for funds that it could not pay out
cash over its counter to the sum of $2,500. Does anyone sup-
pose the general depositor would have deposited that money
in the bank under those circumstances and with that knowl-
edge and notice? Undoubtedly, he would not have done so.
And should a depositor make a deposit under such circum-
stances, no court of equity would give him a preferred lien
on the assets of the bank for that sum on the grounds that the
bank was insolvent at the time of making the deposit and that
he had no notice. A court of equity would rather charge
him with failure to exercise due diligence and impute to him
constructive notice that the bank was then insolvent. This
court has said in *State v. Cramer,* 20 Ida. 639, 119 Pac. 30,
that ''a bank is insolvent when its assets and property are of
such character and value that it is unable to meet its demands
in the usual and ordinary course of business.'' Now, the
question arises at once, Did not the Bellevue bank have notice
when it made this loan to Cramer that the Idaho State Bank
was at the time and the moment prior to the making of the

loan unable to meet its demands in the usual and ordinary course of business, and that the very reason why it was soliciting the procuring this loan of $2,500 was to run it until the following day? In other words, according to Cramer's statement and representation at the time of procuring this loan, he needed this much to run him until the following day. The query arises in my mind at once, Is one bank, making a loan to another bank under such circumstances and conditions and representations, to be allowed after the borrowing bank has gone into the hands of a receiver to come in to a court of equity and rescind the contract and have the receiver declared to be the trustee of a constructive trust in favor of the lending bank? If a constructive trust can be established under such circumstances, then I cannot conceive of any ordinary sale and transfer of property upon the promise of the vendee to pay at a certain time and in a given manner that cannot be converted into a constructive trust in every instance where the purchaser fails to make payment at the time or in the manner specified. To adopt such a rule, however, would be disastrous to business affairs, and would render all commercial transactions precarious and uncertain. There is no more reason for allowing one bank making a loan to another to rescind the contract and pursue the assets of the bank under the theory of a constructive trust, than there is for allowing the individual and private citizen under the same state of facts and circumstances to pursue the same remedy. If, however, this remedy were allowed in all such cases in the ordinary business affairs of life, a large percentage of the sales and transfers of personal property and chattels would be the subject of litigation, and that would always be the case where the purchaser failed or was unable to make payment as promised at the time the sale was made.

The authorities cited on this question in the opinion by the Chief Justice are all of them dealing with a different state of facts from that involved in this case. An examination of these authorities will disclose that they are treating questions where a trust relation is shown to have arisen in the first instance and thereafter been violated, or with the law applica-

ble to depositors, or some such state of facts differing entirely from this case.

The nearest approach to this case to be found among the authorities cited is that of *Corn Ex. Nat. Bank v. Solicitors Loan & Trust Co.,* 188 Pa. 330, 68 Am. St. 872, 41 Atl. 536, and that case differs so widely from this in its facts that a rule of law announced covering those facts cannot be accepted as controlling authority in a case like this.    There the trust company called up the bank by telephone and asked for $2,000 in two-dollar bills, and on receiving a favorable reply by phone, the trust company sent its check on the Fourth Street National Bank, where it had funds on deposit sufficient to meet the check, and the bills, done up in packages, were returned to the trust company by the same messenger who delivered the check to the bank.    The bills were delivered to the bank but the packages were never opened, and the trust company did not open its doors the following day but made an assignment for the benefit of its creditors, and the Fourth Street National Bank had immediate notice of the failure. The bank that had furnished the $2,000 in bills and received the check therefor on the Fourth Street National Bank immediately presented the check for payment, and the Fourth Street National Bank refused to pay on the ground that it had notice of an assignment for the benefit of creditors.    The court allowed the bank to pursue the packages of bills into the hands of the receiver and recover the same on the theory and upon the grounds that there was a total failure of consideration, in that the check given for the bills was wholly worthless and that it would be inequitable under such circumstances to allow the creditors of the bank to have the benefit of this property which still remained intact and had never found its way into the assets of the bank and for which no consideration whatever had passed.

Another important difference between that case and this, and one which alone ought to be sufficient to distinguish the two cases, is that in the Corn Exchange Bank case the bank had no notice of any facts which would put it on inquiry as

to the *solvency of the trust company.*    The very fact that this sum of money was to be in small denominations and that the bank sent its check along in payment therefor would indicate that the bank was securing the money merely for the purpose of making change and that it was well able to pay for the same.    *In the· present case, however, the money was wanted in any denomination possible for the purpose alone of carrying on business and meeting its obligations and on the ground that it was short of funds.*

I am satisfied that this case should be decided upon the proposition that no trust relation has been established. It would follow that the other question discussed by the Chief Justice is not essential to the decision of this case. In view, however, of the fact that the majority have deemed it necessary to consider and pass upon the question of pursuing the assets of a bank in cases where a trust has been established, I must here register my dissent from the apparent views enunciated in the majority opinion. This court has decided in *State v. Thum,* 6 Ida. 323, 55 Pac. 858, *First National Bank of Pocatello v. Bunting,* 7 Ida. 27, 59 Pac. 929, 1106, *State v. Bruce,* 17 Ida. 1, 134 Am. St. 245, 102 Pac. 831, that trust funds may be followed into the general assets of the bank, irrespective of the question of identification, and that the trust may be fixed upon the general assets for the return or payment of the trust estate. The cases of *State v. Thum* and *First National Bank of Pocatello v. Bunting* both involved the same state of facts, and there the record showed that the trust estate, amounting to some $63,000, had been paid out in the regular course of business, and that only $5,300 was left in the bank at the time it went into the hands of a receiver. The facts in those cases were substantially the same as in *State v. Bruce,* and the same principle of equity was involved in all these cases. By the decision of the majority of the court in the present case, it is proposed to overrule a uniform line of decisions of this court covering a period of fourteen years, and now return to a rule long since abrogated rather than to continue to follow what seems to me to be the rule of reason

and justice which has heretofore prevailed in this state.   I cannot give my assent to that proposition.

I think the judgment should be affirmed, but desire to place my concurrence specifically upon the ground that no trust relation has been established in this case.