**WATSON et al. v. JACKSON. (No. 10670.)\***

(Court of Civil Appeals of Texas. Ft. Worth. May 17, 1924. Rehearing Denied June 21, 1924.)

**1. Action �köö68—Refusal to delay trial on merits for prosecution of appeal from order overruling pleas of privilege not error.**

Refusal to delay trial on merits until defendants can prosecute appeal from order overruling pleas of privilege is not error, as defendants, if case is tried during same term, can have ruling considered on appeal from final judgment without separate appeal from order overruling pleas.

**2. Venue ⊙ööö8—Venue of action on unpaid draft held in county of bank advancing money in reliance on telegram from bank promising payment without disclosing condition.**

Undisclosed agreement between purchaser of peanuts and cashier of bank that draft, to amount of which another bank advanced money to purchaser's agent in reliance on telegram, from former bank unconditionally promising to pay drafts on purchaser, would not be paid, unless peanuts were found good on delivery at destination, *held* fraud on latter bank, effective in county of its domicile, so as to fix venue of action on unpaid draft in such county.

**3. Banks and banking ⊙ööö218—Venue of action on unpaid draft held in county of bank paying money in reliance on promise of payment by drawee's bank.**

Under Complete Tex. St. 1920, art. 1830 (Vernon's Sayles' Ann. Civ. St. 1914, art. 1830), par. 24, authorizing suits against corporations, etc., in any county in which cause of action "or part thereof" arose, venue of action on unpaid draft, to amount of which bank advanced money to drawee's purchasing agent, in reliance on unconditional promise of payment by drawee's bank in telegram addressed and delivered to and accepted by former bank in county of its domicile, lies in such county.

**4. Banks and banking ⊙ööö260(4) — National bank's promise to state bank to honor drafts on receipt with bills of lading attached held not ultra vires.**

Promise of national bank to state bank to pay draft drawn on purchaser of peanuts on

⊙ööFor other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

*Writ of error dismissed for want of jurisdiction November 19, 1924.

receipt of draft with bills of lading attached, *held* not mere guaranty of payment, but loan of money on personal security and bills of lading and acceptance, purchase, or discount of negotiable instrument or bill of exchange, as authorized by U. S. Comp. St. § 9661, in view of Complete Tex. St. 1920, art. 6001a—1, pars. 126, 135, 138 (Vernon's Ann. Civ. St. Supp. 1922, arts. 6001—1, 6001—126, 6001—135, 6001—138).

**5. Corporations &#9758;519(1)—Burden of proving defense of ultra vires is on defendant.**

Burden of proving defense of ultra vires is on defendant.

On Motion for Rehearing.

**6. Venue &#9758;7—Venue of action on draft not paid by bank promising to honor it on receipt with bills of lading and weight certificates attached held in county of bank advancing money in reliance on promise.**

Action on unpaid draft, to amount of which bank advanced money in reliance on telegram from drawee's bank promising to "honor draft, * * * original lading, and weight certificates attached," *held* within fifth exception of Rev. St. art. 1830, so as to fix venue in county of former bank's domicile, contract not being executed until its acceptance of telegram, procurement of weights and certificates, and attachment thereof, with bills of lading, to draft.

**7. Venue &#9758;7—Suit on unpaid draft held maintainable against drawee in county of bank advancing money in reliance on unconditional promise to pay by drawee's bank.**

Suit on unpaid draft, to amount of which bank advanced money in reliance on unconditional promise of drawee's bank to honor it on receipt with bills of lading attached, covering shipment of goods for price of which it was drawn, *held* maintainable in county of former bank's domicile as against purchaser, for whose benefit telegram was sent at his instance, without disclosing agreement with him as to condition on which draft would be paid.

**8. Venue &#9758;8—Failure of drawee and bank wiring promise to honor draft to disclose condition on which it would be paid held fraud on bank advancing money in payment for goods purchased by drawee, though before delivery of telegram.**

Failure of purchaser of peanuts and his bank to disclose, in telegram to another bank, unconditionally promising to honor draft on receipt with bills of lading attached, agreement that it would not be paid unless peanuts were in merchantable condition when delivered, *held* fraud on latter bank and drawer of draft, even if it had paid for peanuts, and drawer knew that purchaser desired dry sound peanuts only when telegram was delivered, they having surrendered possession and control of peanuts thereafter solely in reliance on telegram.

Appeal from District Court, Wise County; F. O. McKinsey, Judge.

Action by Henry Jackson against H. H. Watson and another. Judgment for plaintiff, and defendants appeal. Affirmed.

Lacy & Bramlette, of Longview, Prendergast & Prendergast, of Marshall, and M. W. Burch, of Decatur, for appellants.

Taylor & Taylor, of Wichita Falls, and McMurray & Gettys, of Decatur, for appellee.

CONNER, C. J. This suit was instituted by appellee, Jackson, on April 4, 1922, against the First National Bank of Longview and H. H. Watson, to recover the sum of $2,-854.07 upon a certain draft alleged to have been assigned to the plaintiff by the Continental State Bank of Boyd, Wise county, Tex., that had been drawn in payment of specified cars of peanuts that had been bought in behalf of said Watson by one Hays, his agent, and which said draft the said National Bank of Longview had promised to pay upon receipt, with weights, checks, and bills of lading attached.

The defendants appeared and answered by pleas of privilege and other answers presenting issues which, together with the issues presented by the plaintiffs, are sufficiently indicated by the trial court's findings of fact and conclusions of law, which are as follows:

"(1) The First National Bank of Longview, defendant, is a national banking corporation, and at all the times named and involved in this suit had and now has its domicile and place of business in Longview in Gregg county, Tex.

"(2) The defendant H. H. Watson at the time he filed his plea of privilege herein and for many years theretofore resided in Gregg county, Tex.; that about the 15th day of June, 1922, after filing said plea, he removed to and became a resident of Dallas county, Tex., where he has continuously since that time resided and now resides, and is not now nor has he ever been a resident of Wise county.

"(3) The defendant H. H. Watson and the plaintiff, Henry Jackson, for a good many years have been engaged in business at Longview and Boyd, Tex., respectively, the former doing a brokerage and other business in buying and selling farm products including peanuts; and the latter in buying and selling farm products.

"(4) After some correspondence between said parties, said Watson in January, 1921, sent his agent J. H. Hays to Boyd, Wise county, Tex., to purchase and ship peanuts under his directions. The said Hays went to Boyd and entered upon said duties and began the purchase of peanuts from farmers, but, before any were bought, Watson not having furnished money or credit with which to pay for same, at Hays' request or upon an understanding between the plaintiff, Jackson, wired defendant Watson at Longview to have his bank wire the Continental State Bank of Boyd guaranteeing payments of drafts on Watson for peanuts purchased and shipped.

"(5) Watson conferred with the First National Bank at Longview, and made arrangements with it, and in pursance thereof, Watson being a customer of that bank, and for many years having done his banking business and having had many similar transactions with and through said bank, on January 19, 1921, wired

said Continental State Bank at Boyd at follows: 'Will honor drafts on H. H. Watson one to three cars peanuts original ladings and weight certificates attached at seventy cents.'

"(6) That accordingly three cars of peanuts were bought at Boyd at 70 cents, loaded into cars, and shipped according to defendant Watson's instructions, a draft was drawn therefor and sent and presented to defendant First National Bank at Longview, with bills of lading and weight certificates attached, and said draft was paid by said bank.

"(7) On January 21, 1921, a similar telegram was sent by the First National to said Continental State Bank at Boyd that the former would in like circumstances honor draft on Watson for three cars of peanuts at 70 cents, which three cars of peanuts were in like manner bought and shipped, and the bills of lading and weight certificates therefor were attached to draft on Watson, and said draft was in like manner presented to and paid by said Longview bank.

"(8) That thereafter on January 26, 1921, at Watson's instance, said first National Bank at Longview sent to the Continental State Bank at Boyd, Tex., the following telegram:

"'Contl. State Bank, Boyd, Texas. Will honor draft Henry Jackson on H. H. Watson original ladings and weight certificates attached one or more cars peanuts seventy cents. First Natl. Bank.'

"In pursuance of and in reliance upon said telegram, as it had done in the two instances before, the said Continental Bank advanced the money to the amount of the draft sued on herein and set out below, which covered the price and necessary expenses of two cars of peanuts, and said draft was drawn and sent with the bills of lading and weight certificates attached, all in pursuance of the direction of said telegram, and when same was presented to said Longview bank payment on same was refused.

"(9) The draft referred to in paragraph 8 above is as follows:

"'3 cars peanuts..3,476.64　　Continental State Bank,
Expense ........　36.00　　　　Boyd, Texas.
Ex. .............　8.78
　　　　　　　————
　　　　　　$3,521.42　　　　Jan. 27, 1921.

"'B/L attached on demand pay to the order of Continental State Bank, Boyd, Texas, $3,521.42, thirty five hundred twenty-one dollars forty-two cents, value received and charge same to account of H. H. Watson, Longview, Texas. c/o First National Bank.

"'H. H. Watson, by Henry Jackson.'

"(10) On February 3, 1921, after the last-named three cars of peanuts had been shipped, and after the bank at Boyd had advanced the money thereon, and the last draft in question had been drawn and sent as aforesaid, the Longview Bank sent to the Continental Bank at Boyd the following telegram:

"'53 collect. Longview, Tex. 4:50 p. m. 2/3.

"'Continental State Bank, Boyd, Texas. Watson draft returned by another bank. Never been in our hands. Send them direct to us and if original ladings and weight certificates are attached as agreed will honor draft but will expect you to guarantee the weights of your parties as weights are being reported short on cars already paid for.

"'First National Bank.'

"(11) When payment of the draft in question was refused and same returned, the plaintiff took said draft to Longview, and presented it in person to said Longview bank, payment was again refused, the only reason given by the bank therefor being that the quality of the peanuts already shipped was poor, and the bank and Watson refused at that time to have anything further to do with said three cars last shipped. Whereupon said Jackson went to Tyler, to which point said two cars had been shipped under Watson's instructions to his agent Hays at Boyd, and caused said peanuts to be sold, and there was realized therefrom net, $647.35, which sum was applied to the draft, and the balance due on said draft forms the basis of this suit.

"(12) That when said last three cars of peanuts were being bought and loaded it was raining, and in consequence they were made wet, and when they arrived at their destination and were unloaded they were in a badly damaged condition, the kernels being mildewed in consequence of their having become wet while being bought and unloaded from farm wagons, and Henry Jackson in handling same after they had been refused and in reselling them acted with due diligence and prudence, and got for them the best price obtainable under the circumstances.

"(13) All the peanuts involved in these transactions were sound and of good quality when purchased and loaded into the cars, and the damaged condition of the last three cars was due to the negligence of defendant Watson's agent Hays in having said peanuts loaded into the cars and shipped while wet, for which neither the plaintiff, Jackson, or the bank at Boyd were in no wise responsible.

"(14) Neither the plaintiff or the bank at Boyd had any direct pecuniary interest in the peanuts or the sale thereof, other than a general interest in seeing the farmers of the community find a market for their products, and out of the proceeds of the sales so made some of the debts due the bank and Jackson by farmers were paid.

"(15) I find that Hays was the agent of defendant Watson in buying and shipping said peanuts, and that neither the bank nor Jackson was such agent or had anything to do in that matter, nor did they or either of them in any manner conspire with Hays nor did they do any wrongful or improper thing or act in the premises, or any act with the purpose or that had the effect of injuring either of the defendants.

"(16) I find that plaintiff, Jackson, was the public weigher at Boyd, and that as such he weighed the peanuts in question on his public scales, and gave certificates of the weights of the several loads as was usual and customary and as was his duty to do, and that he received therefor the proper and customary weighing fees.

"(17) That before any peanuts were bought for a shipment the telegram from the Longview to the Boyd bank relating thereto would be in the hands of the Boyd bank, and the plaintiff, either at the request of Watson or of Hays, Watson not having provided funds with which to purchase, would draw checks on said Boyd bank in Watson's name with which to pay the farmers for the peanuts, and give same to the farmers, and upon presentation of

same with the weight certificates the bank would pay the checks. After sufficient had been bought to complete a shipment, bills of lading therefor would be procured, which, together with the weight certificates, would be attached to a draft on Watson to cover the shipment and then would be sent for payment to the defendant bank. Before paying out any money in this way, the bank at Boyd required the plaintiff to personally guarantee the payment of the draft, which he did.

"(18) After the draft had been dishonored, the plaintiff, as required by his warranty agreement, paid to the bank at Boyd all the money it had been out on this last shipment and took from said bank an assignment of the draft and all interest and rights of action of the Boyd bank therein, and thus became the owner thereof, and as such he brings this suit.

"(19) I find that defendant Watson did not have funds in defendant bank to cover said drafts when they were drawn, but the first two were paid when presented, and payment of the last was not refused on that ground; Watson and said bank having had many similar transactions during the last several years, and Watson at said times being solvent, and able to take care of said drafts.

"(20) I find that before any of the telegrams from the Longview to the Boyd bank were sent, and after Watson's agent, Hays, had been sent to Boyd, the defendants privately agreed among themselves that the telegrams would be sent intending that the peanuts would be purchased by Watson's agent, and that the bank ·at Boyd would furnish the money on the faith of the telegrams, but that, after the peanuts were shipped, the drafts covering the purchase money therefor would not be paid, and they did not intend to pay drafts therefor unless the peanuts upon delivery at destination were found to be good, which said private agreement and understanding between the defendants were not communicated either to plaintiff or to the bank at Boyd, but they were in entire ignorance of the same, and by procuring in this way the bank at Boyd to pay out money to pay for said peanuts on the strength of the telegrams sent to it was a fraud upon said Boyd bank whereby the damages complained of were sustained.

"(21) Other than as set out in paragraph 20, I find that the defendant Watson was guilty of no fraudulent misrepresentations to plaintiff or to the Boyd bank.

## "Conclusions of Law.

"(1) I conclude that by reason of the fact that the defendant bank sent by wire its proposal to the Boyd bank that the former would honor draft of Jackson on Watson for the three cars of peanuts, and by reason of the acceptance of such proposal and the paying out of the money for the peanuts at Boyd by the bank there concluded the contract between said banks at Boyd, and that the cause of action arose, at least in part, at Boyd, in Wise county. That also by reason of the collusive agreement between said Longview bank and Watson, whereby a fraud was perpetrated upon the bank at Boyd by means of the telegram sent to the bank at that place, the plea of privilege of the defendant bank should be overruled.

"(2) The defendant Watson having removed to Dallas county and become a citizen of Dallas, and being at the time of trial a resident of Dallas county, and the allegation of his plea being that he is a citizen of Gregg county, and the prayer thereof being that the cause be removed to Gregg county, and there being no allegation of residence in Dallas county or prayer that the cause be removed there, and the privilege secured to a defendant by the venue statute being that of having the cause removed to the county of his residence and not to some other county, and furthermore, by reason of the collusive and fraudulent agreement between the defendants adverted to in the finding of facts and in the above conclusion of law, I conclude that the plea of privilege should be denied.

"(3) I find that the method of the transaction herein is one in common use in such transactions, that the bank at Boyd, when it received the telegram in question, had the right to assume that Watson had money on deposit with the Longview bank to cover the draft, or had credit therewith for that purpose, or that Watson had made arrangements with his bank to have said draft taken care of, and that the defendant bank ought not now to be heard to say that ·its acts were ultra vires.

"(4) I conclude that the plaintiff ought to recover of both defendants the unpaid balance of the money evidenced by the draft in question; and judgment is rendered in, accordance with the foregoing conclusions."

Judgment was rendered in accordance with the court's findings, and the defendants have duly prosecuted this appeal.

[1] Appellants first complain of the action of the court in overruling their pleas of privilege and in refusing to delay the trial upon the merits until they could prosecute an appeal from the order overruling their pleas, to which order they had duly excepted and given notice of appeal. Section A of the Commission of Appeals in the case of Smith Bros. Grain Co. v. Windsor & Stanley, 255 S. W. 158, held, with the approval of the Supreme Court, that, when a plea of privilege is overruled, the trial court may at once proceed to a trial·on the merits, and, if the case is tried during the term in which it was overruled, defendant can by proper exceptions have the ruling of the court considered on appeal· from final judgment without a separate appeal from the order overruling the plea. This ruling was followed in the later case of Martin v. McKean & Neal, 257 S. W. 241, by the same section of Commission of. Appeals, approved by the Supreme Court. Appellants' first complaint must accordingly be overruled.

[2] This, however, but brings us to the next complaint, which is that the trial court erred in overruling the plea of privilege. Our discussion of the court's conclusions of law will indicate the contentions made.

It will be noted from the court's conclusions of law that the jurisdiction in Wise county was retained on two grounds: First, that the "cause of action arose, at least in part, in Boyd, Wise county," and, second, that by reason of the "collusive agreement

between said Longview bank and Watson a fraud was perpetrated upon the bank at Boyd by means of the telegram sent to the bank at that place." We do not feel prepared to hold that the court was in error in either of such conclusions. We think the evidence sufficient to sustain a finding by the court, as indicated in paragraph 20 of his conclusions of fact, that prior to the sending of the telegram on January 26, 1921, by the First National Bank of Longview, set out in the eighth paragraph of the court's conclusions of fact, that the managing officer of the Longview bank and Watson, privately agreed among themselves that the telegram should be sent, but with the intent on their part that the draft would not be paid, unless the peanuts on delivery at destination were found to be good, and that such private agreement and understanding was not communicated to the Continental State Bank. It will be noted that the telegram from the Longview bank, in effect, is an unconditional promise on its part to pay the draft, and that nothing therein indicates that the Continental Bank or plaintiff, Jackson, was charged with the duty and responsibility of determining the quality of the peanuts shipped and represented by the bill of lading attached to the draft. There is evidence in behalf of the plaintiff which tends to show that Watson's agent, Hays, was alone charged with the duty of inspecting and determining the grade of peanuts to be purchased and shipped. The defendant Watson himself testified that he had sent Hays to Boyd and instructed him to buy peanuts; that "my instructions were for Mr. Hays to see every wagon, to see all the peanuts he bought he could. I instructed him, 'Don't load too fast, load slow.'"

Plaintiff, Jackson, testified to the effect that he merely weighed the peanuts, and at the request of Mr. Hays would sign weight tickets and write checks on the Continental Bank in payment to the farmers; that he owned none of the peanuts, bought none of them, and did not pass on the quality of them; that "when Mr. Hays would buy them the first I would know of it would be when the wagon would come to the scales. Then I just weighed them and gave him the ticket and check."

It is true that defendant Watson and the cashier of the bank testified that they had no purpose or intent of committing a fraud in sending the telegram, but, as it seems to us it cannot be said that the failure to disclose the private agreement between them to the effect that the checks would not be paid unless the peanuts were sound and merchantable did not operate as a legal fraud, whether so intended or not on the Continental Bank, which, so far as the evidence discloses, was charged with no duty whatever to examine or guarantee or give assurance of any sort that the peanuts were such as were merchan-table. The bank, by the positive form of the telegram, was given to understand that upon the receipt of the draft it would be paid, it, as well as Jackson, having reason to believe that Watson and the bank were trusting to Watson's agent Hays to do his duty in respect to his inspection of the peanuts purchased; thereby the bank was induced to ship the peanuts with bills of lading attached, and thus lose whatever security was thereby afforded it. Hence the undisclosed agreement between the cashier of the Longview bank and the defendant Watson was made effective at Boyd, Wise county, to the damage of the Continental State Bank.

The case of Johnson v. Cole, by this court, 258 S. W. 850, was one in which Cole had been given a check payable to himself and Helene Johnson. Cole lived in Bell county, and Mrs. Johnson lived in Tarrant county. Cole sent his agent to see Mrs. Johnson in Tarrant county, with instructions to secure her indorsement so that the check could be collected. There was evidence tending to show that Cole at the time intended to appropriate the proceeds of the check when collected to the payment of an indebtedness of the husband of Mrs. Johnson. But such intention was not communicated to the agent who interviewed Mrs. Johnson, and she was without knowledge of such purpose on the part of Cole. Cole later in fact appropriated Mrs. Johnson's interest in the proceeds as he had intended, and Mrs. Johnson sued to recover in Tarrant county. We held, in effect, that the procurement of Mrs. Johnson's indorsement on the check under such circumstances operated as a legal fraud, a part of which at least occurred in Tarrant county, and hence that suit by Mrs. Johnson was maintainable in that county. See, also, Oil Co. v. Scott, 28 Tex. Civ. App. 213, 67 S. W. 451; Graves v. McCollum & Lewis (Tex. Civ. App.) 193 S. W. 217, to the effect that false representations made in the county will give jurisdiction to the courts of such county. While the agreement or understanding between Watson and the cashier of the bank at Longview was not made in Wise county, the telegram promising unqualified payment was delivered in Wise county, unaccompanied by a disclosure of the secret agreement. It was the failure to disclose the secret agreement that operated as a legal fraud, and this failure occurred in Wise county.

[3] However, if we are in fault in the foregoing conclusions, we think there is yet another ground of jurisdiction comprehended within the court's findings that will sustain the action in Wise county. Paragraph 24 of article 1830, Complete Texas Statutes of 1920 (Vernon's Sayles' Ann. Civ. St. 1914, art. 1830), reads, so far as pertinent, as follows:

"Suits against any private corporation, association or joint stock company may be com-

menced in any county in which the cause of action, or a part thereof, arose," etc.

In the case of Phillio v. Blythe, 12 Tex. -124, Judge Hemphill discusses the elements of a cause of action. He says:

"It may be defined to consist as well of the right of the plaintiff in the action, as of the injury to such right. In Chitty on Pleadings, vol. 1, p. 288, the three principal points of a cause of action are said to be: The right whether founded upon contract or tort; (2) the urging to such right; and (3) the consequent damages. It may be admitted that the terms cause of action are sometimes used in a more limited sense, and that where the cause is founded on a contract, the contract itself is denominated the cause of action; but more frequently, and where the terms are used with more precision and accuracy, the terms embrace a much wider scope, and include not only the contract, but its performance, if executory, and also the breach of such contract. For instance, the statute requires a plaintiff, in his petition, to set forth a full and clear statement of his cause of action. This requisition would not be filled by a bald statement of the term of the contract, if a contract lay at the foundation of the action. An averment of the performance of the contract by the plaintiff, of its breach by the defendant, and, according to Chitty, of the consequent damages, is equally essential with a statement of the terms of the contract itself, as, together, they contribute the body, or substance, of the cause of action."

That was a case in which the contract for the construction of a building was made in the precinct of the plaintiff's residence where he sued, and the construction of the building was in another precinct, where it was contended the venue should have been laid. The court, after discussing the difficulty in fixing venue in mixed transactions of this kind, where the cause partly accrued in one place and partly in another, determined that, under the statutes then controlling the venue in suits in justice courts, the venue of suits under the statutes under consideration was more properly brought in the precinct where the building had been constructed, inasmuch as it was there that the witnesses to the value of the work, or its defects, would most probably live, etc. Our library does not contain the old digests of law by Oldham and White, and Paschal, but that decision was at the Tyler term, 1854, and we assume that it was predicated upon an act approved March 20, 1848, entitled "An act to organize justice courts, and to define the powers and jurisdiction of the same," published in Gammel's Laws of Texas, vol. 3, p. 163, § 30, which provides, so far as necessary to quote, that:

"No person shall be sued before any justice of the peace except in the precinct where such person resides, or in the precinct where the cause of action accrued, if in the same county," etc.

But it is to be noted that in the statute now under consideration the suit may be commenced in any county in which "the cause of action, or any part thereof, arose." The addition of the words which we have italicized is significant in view of Judge Hemphill's discussion of the elements of a cause of action, and we think the view presented by him in accord with the authorities generally. See Lumber Co. v. Water Co., 94 Tex. 456, 61 S. W. 707. We think it must be conceded that the failure alone of appellant bank to pay the draft under consideration would not authorize an action in the court of any county. It would be necessary for the plaintiff to prove that such failure constituted a breach of a contract to pay. In other words, the contract as well as the breach constitutes the cause of action; the contract being an essential element. If we are correct in such reasoning, we think we must sustain the trial court's conclusion to the effect that at least a part of the cause of action in this case arose in Wise county. It is undisputed that the promise of the Longview bank to pay the draft was addressed and delivered to the Continental State Bank and accepted by the latter in Wise county, and that pursuant to such acceptance fulfilled its part of the contract by shipping the peanuts with bills of lading attached, as directed.

Mr. Williston on Contracts, vol. 1, p. 115, § 64, says:

"Acceptance of an offer is necessary to create a simple contract, since it takes two to make a bargain. An offer to contract is a proposal to exchange a promise or an act for a specified promise or act of another, and obviously requires the latter's assent in order that the transaction shall be complete. Moreover, the so-called acceptance of the offeree is frequently more than an acceptance; it is also a giving of the consideration requested by the offer by the same words or acts which indicates assent."

And in section 97 of the same work it is said:

"If the acceptance is made immediately after the offer when the parties are together, no question can arise as to the place of the contract. The place where the parties are is the only possible place of contract. But if the acceptance is not made simultaneously with the offer, and is made in a different place, the universal principle disposing of this and any similar question is that the place of the contract is the place where the last act necessary to the completion of the contract was done; that is, where the contract first becomes a legal obligation. If an offer contemplates a unilateral contract and calls for the performance of an act, the place where that is done is the place of contract. Thus, if goods are shipped in conformity with an offer, the place of the contract is the place of shipment, since the act requested is the transfer of title to the goods by shipment."

To the same effect on this question is one of our own decisions, to wit, Cuero Cot-

ton Oil & Mfg. Co. v. Feeders' Supply Co., 243 S. W. 79. If further support of our conclusion on this subject be needed, we will refer to the case of Railway Co. v. Hill, 63 Tex. 381, 51 Am. Rep. 642. In that case the subdivision of the statute now under consideration was involved. Chief Justice Willie referred with approval to the case of Phillio v. Blythe, supra, and held that the contract there under consideration, having been made in Galveston county and to be there partly performed, conferred venue over the defendant in that county.

We accordingly conclude that the court below did not err in overruling the appellant's plea of privilege, it being undisputed that the telegram to the Continental State Bank promising payment of the draft was sent by the appellant national bank after a conference with and approval by the appellant Watson.

[4, 5] We think but one vital question remains for determination, and that is, whether the appellant bank's plea of ultra vires was well taken. Appellant's contentions are, in substance, that the telegram to the Continental State Bank was but a simple guaranty on the part of the national bank to pay the obligation of appellant Watson, and that under the United States Compiled Statutes, § 9661, neither the president nor the cashier of the national bank had authority to guarantee the payment of the draft of Henry Jackson on H. H. Watson. The principal cases cited by appellant in support of these contentions are: Groos v. Brewster (Tex. Civ. App.) 55 S. W. 590; First National Bank v. Bank, 173 Mo. 153, 72 S. W. 1059; Fidelity, etc., Co. v. Bank, 48 Tex. Civ. App. 301, 106 S. W. 782; First National Bank v. Crespi & Co. (Tex. Civ. App.) 217 S. W. 705; Alex Woldert Co. v. Bank (Tex. Civ. App.) 234 S. W. 124. The act of Congress referred to is to be found in the United States Compiled Statutes 1916, Annotated, vol. 9, p. 11782. Section 9661 is contained in chapter 1, of title 62, regulating the organization and powers of national banks. The section provides, among other things, that such associations shall have power "to make contracts" and " to exercise by its board of directors, or duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes according to the provisions of this title."

At the hazard of unduly extending this opinion we will undertake to briefly discuss the opinions hereinbefore cited in behalf of appellants in favor of their contention. But

before doing so, and for the sake of perspicuity, we will first set forth the precise circumstances of this case. As already indicated, Watson sent his agent to Boyd in Wise county for the purpose of buying peanuts, but provided him with no money for that purpose, and Hays, in order to procure the money, went to the Continental Bank to secure it. The cashier of this bank testified that:

"When he [Hays] came to the bank, he made arrangements with me to buy the peanuts. He said he had come to buy for H. H. Watson, buy some peanuts, and that Mr. Watson would have his bank at Longview to wire the Continental State Bank at Boyd to advance the money on the peanuts."

Pursuant to this arrangement the appellant bank addressed its first telegram as follows:

"Contl. State Bank, Boyd, Texas.

"Will honor draft on Watson two cars peanuts original lading and weights certificates attached at seventy cents.

"[Signed] First National Bank."

Based on this telegram, Hays bought and shipped three cars, which were shipped out bill of lading and weight certificates attached, and the appellant bank paid the draft. Later, pursuant to a second telegram, in form as the first, two other cars were purchased, shipped, and paid for by the appellant bank. Yet, later it appears that, after Hays had purchased some three more cars of peanuts, he left the vicinity and arranged with appellee, Jackson, to have the same billed and shipped as directed, and draw draft on Watson therefor. Before Jackson did so, and before the Continental Bank would agree to advance the money therefor, it required Jackson to guarantee the payment of the draft, which Jackson did after receiving the following telegram from the appellant bank in answer to inquiry duly made, to wit:

"Contl. State Bank, Boyd, Texas.

"Will honor draft Henry Jackson on H. H. Watson original ladings and weights certificates attached one or more cars peanuts seventy cents. [Signed] First Natl. Bank."

It is the draft drawn pursuant to this last telegram that constitutes the foundation of this suit. The cashier of the Continental State Bank testified that he paid the checks of Hays given to the farmers for peanuts upon the faith of these telegrams and the security afforded by the bills of lading.

The case of Groos v. Brewster (Tex. Civ. App.) 55 S. W. 590, is one, as will be seen by a careful examination, based upon a communication by a San Antonio bank to a Laredo bank, and to which Brewster was not a party and which the court construed, not as a draft or a check, but as one which in legal effect contained no guaranty on the

part of the San Antonio bank to pay the checks drawn by Brewster on Groos & Co., the shippers of certain cars of corn.

The First National Bank v. American National Bank, 173 Mo. 153, 72 S. W. 1059, was a suit by an Idaho bank against a Kansas City National Bank, and presents facts in many features quite similar to the one before us. But the suit by the Idaho bank was based upon telegrams to the effect that drafts drawn by an agent on his principal for cars of choice sacked potatoes "will be paid." The decision is by Division 1 of the Supreme Court of Missouri, and the telegrams were construed as in the nature of guaranties upon which the Kansas City Bank was not liable. It will be noted that the telegram is susceptible of the construction that the Kansas City bank merely gave assurance that the drawee would pay the drafts and not to an unconditional promise of its own to pay. Hence the conclusion reached that the instrument was but a guaranty for the debt of the drawee and that the Kansas City bank was not liable thereon is perhaps justified on the theory that the burden of proof rested upon the plaintiff bank to show that the telegrams were intended to convey a different interpretation.

The case of Fidelity Co. v. National Bank of Commerce, 48 Tex. Civ. App. 301, 106 S. W. 782, was based upon an instrument expressly declared not to be a check, draft, or negotiable instrument, but, on the contrary, one making the liability of the promisor conditional and not absolute.

The case of First National Bank v. Crespi & Co., 217 S. W. 705, by the Austin Court of Civil Appeals, is one in which it appears that Crespi & Co. instituted suit against J. B. Snell and the First National Bank of Moody, Tex., to recover damages for a breach of contract between Crespi & Co. and Snell, whereby Snell agreed to sell and deliver to Crespi & Co. 125 bales of cotton. It is stated that "the First National Bank of Moody was sued as a guarantor of the contract upon this indorsement: 'We guarantee the fulfillment of this contract. First National Bank, by J. W. Donaldson, cashier.'"

The case of Alex Woldert Co. v. City National Bank (Tex. Civ. App.) 234 S. W 124, was determined by the Texas Court of Appeals, and this case also in many of its particulars is very similar to the one before us. The Alex Woldert Company were dealers at Tyler, Tex., in pecans, peanuts, and peas, and its agent in Georgia secured from a Georgia bank the money with which he purchased certain cars of peaches by drawing drafts on his principal which the Tyler bank promised to pay, but which later both the Alex Woldert Company and the Tyler bank refused to honor. Each of the checks, however, so drawn by the agent of the Woldert Company and cashed by the Georgia bank had indorsed thereon "payment of this draft is guaranteed by Citizens' National Bank." The principal discussion of the court relates to the liability of Alex Woldert Company upon the drafts, the liability of the Tyler bank being predicated upon the statement that "its attitude in this transaction was that of a guarantor only. That such was the construction put upon its conduct is indicated by the memoranda written on each draft. The Tyler bank had no interest in this transaction, and its cashier had no authority to gratuitously guarantee the payment of drafts thereafter to be drawn on one of its customers," citing the articles of the United States statutes from which we have hereinbefore quoted, and notes thereunder.

We have examined numerous other cases, but have found none supporting appellant's contention of authoritative force more closely in point than those just reviewed, and we are of the opinion that this case is distinguishable from them all. As we have seen, section 9661 of the United States statutes, from which we have quoted, expressly empowers a national bank "to make contracts" and confers upon such banks and its duly authorized officers or agents "all such incidental powers as shall be necessary to carry on the business of the bank by discounting and negotiating notes, drafts and bills of exchange and other evidences of debt," and "by loaning money on personal security."

The court finds, and the evidence tends to show, that by some arrangement not clearly disclosed by appellants the appellant bank agreed with Watson to pay the drafts of Watson's agent, and sent to the Continental State Bank its unqualified and unconditional promise to pay to that effect, and that upon such promise the Continental Bank paid out its money and surrendered the possession and title to the peanuts shipped in accordance with the directions of Watson. It affirmatively appears that the Continental Bank credited the appellant bank and not Watson. Among other things, Watson testified:

"My business has been in the grain and hay line. I have handled cottonseed and peanuts for 7 or 8 years. I have handled grain and hay for about 17 years. * * * I had made arrangements with Mr. Foster to pay for those peanuts at that time. I had represented to Mr. Foster that the peanuts were good. I was doing business at Longview, buying both locally and in carload lots. I occupied a house there. I suppose the stock I had on hand, everything in my business, would run the 1st of January, 1921, stuff was pretty high, I don't know, around $15,000 or $20,000."

Mr. Foster, the president of the bank, testified:

"I had known Mr. Watson a good while. He was doing business with our bank when I became connected with it, about four years ago.

Mr. Watson was engaged in wholesale grain business at Longview, including cotton seed and peanuts, and things like that; doing a kind of brokerage business, buy peanuts and sell them consigned to somebody else in car, stopping in transit; been doing that for some time; been doing business with the bank that way. We had had his account for several years, ever since I had been in the bank. I knew his business, knew his course of dealing, and how he did business, as well as anybody. I had had considerable experience with Mr. Watson, his way of dealing, etc., buying stuff, and I had handled his account for the four years I had been in the bank. * * * At the time I sent the telegrams I sent them in accordance with the contract I had with Mr. Watson that the peanuts would be sound and merchantable."

It seems to us that the promise of the appellant bank is fairly susceptible of the construction that it is within the powers conferred upon national banks by the section from which we have more than once quoted. The check drawn by the Continental Bank with bill of lading attached was undoubtedly a negotiable instrument, as defined in article 6001a—1, Complete Texas Statutes of 1920 (Vernon's Ann. Civ. St. Supp: 1922, art. 6001—1), and a "bill of exchange," as defined in the same articles of the statutes, paragraph 126 reading:

"A bill of exchange is an unconditional order in writing addressed by one person to another, signed by the person giving it, requiring the person to whom it is addressed to pay on demand or at a fixed or determinable future time a sum certain in money to order or to bearer."

Paragraph 135 of the same article provides that:

"An unconditional promise in writing to accept a bill before it is drawn is deemed an actual acceptance in favor of every person who, upon the faith thereof, receives the bill for value."

Paragraph 138 provides:

"A bill may be accepted before it has been signed by the drawee, or while otherwise incomplete," etc.

The substance, therefore, we think is that the appellant bank, in its usual course of banking business, was loaning its money to Watson on his personal security and on the security afforded by the bills of lading, and, in effect, substantially accepted, bought, or discounted the negotiable instrument or bill of exchange represented by the draft drawn on Watson by Jackson which is the foundation of this suit. The burden of proof was upon appellants to establish the plea of ultra vires, and we do not think they have discharged this burden.

It follows that the trial court was correct in holding that the appellant bank should be held liable on its promise. See Elliott v. First National Bank, 105 Tex. 547, 152 S. W. 808, First National Bank of Pharr v. San Juan State Bank (Tex. Civ.

App.) 189 S. W. 745; First National Bank of Greenville v. Greenville Cotton Oil Co., 24 Tex. Civ. App. 645, 60 S. W. 828; First National Bank of Dunn v. First National Bank of Massillon (D. C.) 210 Fed. 542.

Other questions presented in the brief of appellants will not be discussed because of the length of this opinion, and inasmuch as we think they are but incidental and not controlling. All propositions will be overruled, and for the reasons stated the trial court's findings of fact which we think are sustained by the evidence, and his conclusions of law are adopted and the judgment affirmed.

### On Motion for Rehearing.

[6] Appellants separately present motions for rehearing. The bank assails our conclusion in upholding the findings of the trial court relating to the bank's plea of privilege and its plea of ultra vires. It is insisted, in substance and among other things, that the bank's telegram cannot bring the case within the fifth exception of article 1830, Rev. Statutes, for the reason that the promise to pay was evidently to be performed in Longview, Gregg county, and not in Wise county, the place of the suit. The telegram, however, was to "honor draft of Henry Jackson on H. H. Watson, original lading and weigh certificates attached." The telegram, therefore, did not become an executed contract until its acceptance by the Continental Bank and a procurement of the weights and certificates thereto, and together with the bills of lading, attaching them to the draft on Watson. These acts and performances were necessarily and actually performed in Wise county by the Continental Bank, thus completing the contract and bringing the case within the fifth exception to the general statute relating to venue which appellants so strenuously urge, as we think must be seen on consideration of the decisions relating to this point cited in our original opinion.

[7,8] There is a further contention on the part of appellant Watson to the effect that he was not a party to the telegram under consideration, and that therefore the venue of the suit in Wise county was not maintainable as against him, even though it might be as against the appellant bank under the fifth exception to the statute, and, further, that the fraud which the trial court imputed to the undisclosed agreement between appellants at Longview to pay the Jackson draft on Watson in event only the peanuts were merchantable was committed in Longview, Gregg county, and not in the county of the suit. But, as it seemed to us on original hearing, the fraud consisted, not so much in the fact that appellants made the agreement to that effect, but rather upon the fact that the agreement to that effect was not disclosed to the Continenal Bank or

to Jackson at the time the delivery in Wise county to the Continental Bank had been made, thereby inducing the bank and Jackson to ascertain weights, procure bills of lading, and attach certificates of weights and bills of lading to the draft on Watson, and thereby surrender, which might not otherwise have been done, possession and immediate control of the peanuts in the shipment. Appellant Watson, we think, under the evidence and findings, was clearly a party both to the telegram and to the fraud. The telegram was sent by the appellant bank with full knowledge and consent and at the instance of appellant Watson and for his benefit, in part at least. So, too, as to the duty of disclosing to the Continental Bank the qualification agreed upon between appellants as to the payment of Jackson's draft when it came. Another contention presented in this connection is that the failure to disclose the qualification in the payment of Jackson's draft could not operate as a fraud, for the reason that at the time of the delivery of the telegram to the Continental Bank it had already parted with its money, and that appellee, Jackson, then knew from previous communications that Watson desired the purchase of dry and sound peanuts only, and that he therefore was not in any manner deceived. But we do not think the evidence makes it clear by any means that at the time the appellants sent the telegram to the Continental Bank at Boyd that it would pay Jackson's draft on Watson that the peanuts at that time had been paid for. We think the evidence on the whole tends to show that the peanuts had perhaps been contracted for and weighed and certificates of weights and amounts due delivered to the farmers who were later paid by the Continental Bank upon the assurances of the telegram and of Jackson. At all events, if the bank in fact had theretofore paid out the money for the peanuts, they had remained in the possession and control of Jackson and the Continental Bank, and they only surrendered the possession and control upon receipt of and in reliance upon the telegram.

For the reasons now and originally stated, we think appellants' motion for rehearing should be overruled, and it is so ordered.

BUCK, J., not sitting.