533 F.2d 290
 CALCASIEU-MARINE NATIONAL BANK OF LAKE CHARLES, Plaintiff-Appellee,
v.
AMERICAN EMPLOYERS' INSURANCE CO., Defendant-Appellant.
LOUISIANA BANK & TRUST CO., Plaintiff-Appellee Cross Appellant,
v.
The EMPLOYERS LIABILITY ASSURANCE CORP., Defendant-Appellant
Cross Appellee.
 Nos. 74-3918, 75-1427.
 United States Court of Appeals,
Fifth Circuit.
 June 14, 1976.
 
 Karl E. Boellert, John A. Jeansonne, Jr., Lake Charles, La., for Calcasieu-Marine Nat. Bank.
 Marian Mayer Berkett, Charles F. Seemann, Jr., New Orleans, La., for American Emp. Ins. Co. and Emp. Liability Assur. Corp.
 Nolan J. Edwards, Homer Ed Barousse, Jr., Edmond M. Reggie, O. W. Boswell, II, Reggie Harrington & Boswell, Crowley, La., for La. Bank & Trust.
 Appeals from the United States District Court for the Western District of Louisiana.
 Before WISDOM, COLEMAN and GEE, Circuit Judges.
 WISDOM, Circuit Judge:
 
 
 1
 Before us are two diversity cases in which the critical legal question is substantially the same. American Employers' Insurance Company appeals from a judgment, on a bankers blanket bond, in favor of the Calcasieu-Marine National Bank (Calcasieu). The Employers' Liability Assurance Corporation, Ltd., appeals from a judgment, on a similar bond, in favor of the Louisiana Bank and Trust Company of Crowley, Louisiana (Louisiana Bank). In view of this Court's disposition of the two appeals, only one opinion is necessary.
 
 
 2
 Each bank claimed that losses incurred by it, with respect to various transactions culminating in the bankruptcy of a bank customer, were covered by the respective bonds. The defendants denied liability on numerous grounds. We reverse the district court judgments for the plaintiffs. First, we hold that the losses sustained by Calcasieu and by Louisiana Bank fell within a bond provision that excluded coverage for losses due to bank loans. Second, we hold that the remainder of the alleged loss suffered by Louisiana Bank was not a loss at all.
 
 
 3
 * FACTS
 
 
 4
 Both cases arise out of the transactions of the banks with two rice mills and with Jack R. Smith, the president of both mills. The Lake Rice Mill, Inc., (Lake) and the Rex Rice Co. (Rex) were in the business of purchasing "rough" rice from farmers, milling and cleaning the rice, packaging the rice in varying quantities, and selling the rice to food companies.
 
 
 5
 The Calcasieu/Lake transaction began when Lake deposited with Calcasieu a draft on the Grace-Kennedy Company (Grace-Kennedy), a Canadian purchaser of rice, for $63,300. Calcasieu, according to its custom, immediately credited Lake for the amount of the draft and forwarded the draft to its correspondent bank in New York for collection. This draft was not honored by Grace-Kennedy for a number of reasons: some of the rice had been damaged and some, apparently, had never been shipped. Instead of honoring the draft, Grace-Kennedy drew a check in the amount of $40,594.40, the adjusted purchase price, to the order of Rex and sent this check to Rex. The check was deposited in Rex's account at Louisiana Bank on February 10, 1969.
 
 
 6
 Meanwhile, however, another draft on Grace-Kennedy was prepared by Lake and was supported by a Rex invoice.[1] This draft also reflected the adjusted purchase price of $40,594.40 and, on February 6, 1969, was deposited, as the first draft had been, with Calcasieu for collection. Because money due on the same transaction had already been advanced, Calcasieu adjusted Lake's bank balance to reflect the lower purchase price; it continued to credit Lake with $40,594.40, minus a "service charge" that amounted to interest on its previous advance. Of course, when Grace-Kennedy was presented with the second draft, it did not pay that draft because it had already paid Rex for the same rice directly by check. Calcasieu was notified of the dishonor of the second draft after one and one-half months had elapsed and both rice mills had been closed. Calcasieu's claim arises from the loss on this second draft.
 
 
 7
 The events which led to Louisiana Bank's claim against its bondsman occurred closer to the demise of the two mills. Louisiana Bank had given Rex credit on seven drafts drawn by Rex on Connell Rice and Sugar Co. (Connell) to cover the purchase of rice sold to Connell. These drafts were not accepted by Connell because the attached documentation was either incomplete or incorrect. Again, by the time the bank became aware of the dishonor, Rex had collapsed.
 
 
 8
 Louisiana Bank also claims to have lost money by honoring two checks, deposited with it by Jack Smith for the Rex account, that were returned for insufficient funds (NSF) and for which no collection was ever made. Louisiana Bank was, at the time Smith deposited the checks, holding numerous "rough rice drafts" drawn on Rex's account for the benefit of farmers who had sold rice to Rex. These drafts, having been held by the bank for more than twenty-four hours without acceptance or dishonor, were considered "stale". Under Louisiana law at that time, Louisiana Bank would have been liable itself on these drafts if they had been regular on their faces.[2] The bank, anxious about the stale drafts, asked Jack Smith to pay for some of them. Smith drew two checks, totalling $110,509.80, on Lake's account with Calcasieu and deposited these into the Rex account with Louisiana Bank. He then wrote a Rex check to Louisiana Bank for $104,566.84, and the bank paid off a similar amount in stale rough rice drafts with its own cashier's check. The Lake checks, sent through normal banking lines for collection, were returned NSF.
 
 II
 THE LOAN EXCLUSION
 
 9
 The bonds contained the following exclusionary provision:
 
 THIS BOND DOES NOT COVER:
 
 10
 (d) any loss the result of the complete or partial nonpayment of or default upon any loan made by or obtained from the Insured, whether procured in good faith or through trick, artifice, fraud or false pretenses, . . . .
 
 
 11
 With respect to the Grace-Kennedy drafts and the Connell drafts, the bondsmen contend that the extensions of credit to the rice mill accounts, pending collection of those drafts, constituted a "loan" for the purposes of the bond exclusion. The banks argue that there was no loan; rather, they argue that the transactions were merely advances of credit pending the collection of various items in the normal course of business and that such advances, not commonly referred to in banking terms as loans, cannot be deemed included in the bond exclusion.
 
 
 12
 This is, as far as we can determine, a question of first impression in the federal courts of appeals. The analysis begins with a review of prior cases considering related problems.
 
 
 13
 The closest case on the facts is National Bank of Paulding v. Fidelity and Casualty Co., S.D.Ohio 1954, 131 F.Supp. 121. Stoller, who bought, sold, and warehoused seeds and grain, was in the practice of drawing sight drafts on his purchasers. His bank would, upon receipt of the draft, an invoice to the customer, and a bill of lading, credit Stoller's account with the amount of the draft and forward the papers for collection. While the draft was being collected, the bank would charge Stoller's account with interest. The bank lost money when it advanced credit on drafts supported by fictitious accompanying documents. The defendant bondsman tried to relieve itself from liability by reference to the same bond exclusion as is involved here. The district court held that the transaction was not a loan. A loan was described as "a contract (for which) there must be a meeting of the minds". There was no meeting of the minds because "(t)he plaintiff bank expected a return of its money in the same manner that it had received it in the previous transactions". The district courts in Calcasieu and Louisiana Bank relied on Paulding in finding that the instant transactions did not amount to loans. See, e. g., 388 F.Supp. at 468.
 
 
 14
 The bonding companies argue that Maryland Casualty Co. v. State Bank and Trust Co., 5 Cir. 1970, 425 F.2d 979, has modified, in this circuit, the availability of the Paulding -based argument. In Maryland Casualty, Behring negotiated a loan with the bank; the loan was secured by valueless warehouse receipts. The district court held the loan exclusion clause inapplicable, because "Behring knew . . . not only that the warehouse receipts were valueless but also that he never intended to repay the money. He wanted to steal the money, not to obtain a loan, and he simply used the mechanics of the loan procedure to effect the theft". 425 F.2d at 981. We reversed, observing nothing of "the slightest persuasiveness that the exclusionary clause of the bond can be nullified by the subjective fraudulent intent of the borrower, notwithstanding that the objective indicia all point one way that a loan was made by the Bank to the partnership". Id. It is possible to read the two district court opinions here as having fallen into the same mistake as the district court in Maryland Casualty ; that is, the district courts may have relied upon that part of Paulding in which the court focused on Stoller's obviously fraudulent intent. The Paulding court had emphasized "the elements of the transactions which constitute . . . false pretenses . . . . There were no elements of loans in these transactions". This observation was quoted in Calcasieu, and the Louisiana Bank court approved of Calcasieu's reading of Paulding.
 
 
 15
 Finally, we note National Bank of Commerce in New Orleans v. Fidelity and Casualty Co., E.D.La.1970, 312 F.Supp. 71. There, the bank was victimized by a check-kiting scheme.[3] The district court rejected the bonding company's argument that the loan exclusion applied.[4] It stated that "(t)he policy exclusion contemplates a lending transaction knowingly entered into by the bank in reliance on the customer's express agreement to repay, most often for the purpose of making a profit on the interest". The court also relied on Paulding's observation that "there must be a meeting of minds". Id. at 75. Maryland Casualty had not yet been decided. The decision in National Bank of Commerce was affirmed, per curiam, by this Court. 437 F.2d 96. The banks here rely heavily on an analogy between check-kiting cases and the instant cases. Although the analogy is strong, we find it unpersuasive. Before delineating our reasons, however, we refer to general principles of insurance law.
 
 
 16
 First, we observe that this is a diversity action; Louisiana law applies. Birmingham Fire Insurance Co. v. Adolph, 5 Cir. 1967, 379 F.2d 948, 951.[5] Although we rely on Louisiana cases, cases from other jurisdictions will be relevant because "(t)he law of insurance is the same in Louisiana as in other states". Brown v. Life and Casualty Insurance Co., La.App.1933, 146 So. 332, 334; Jernigan v. Allstate Insurance Co., 5 Cir. 1959, 269 F.2d 353, 355.
 
 
 17
 An insurance policy is a contract, and the rules established for the interpretation of agreements are applicable to such policies. See Theye Y Ajuria v. Pan American Life Insurance Co., 1964, 245 La. 755, 161 So.2d 70, cert. denied, 377 U.S. 997, 84 S.Ct. 1922, 12 L.Ed.2d 1046; Wiley v. Louisiana and Southern Life Insurance Co., La.App.1974, 302 So.2d 704, writ denied, 305 So.2d 540, 541; Latino v. Hardware Mutual Casualty Co., 5 Cir. 1969, 413 F.2d 1043.
 
 
 18
 The banks' position is arguably fortified by special rules applicable to insurance policies. It is commonly said, for example, that exclusions in insurance policies must be clearly expressed. See Snell v. Stein, 1972, 261 La. 358, 259 So.2d 876, 878-79; Kendrick v. Mason, 1958, 234 La. 271, 99 So.2d 108, 116; Birmingham Fire Insurance Co. v. Adolph, 379 F.2d at 952. The insurer has the burden of proving an exclusion. See Standard Life Insurance Co. v. Hughes, 5 Cir. 1957, 240 F.2d 859, 861-62; Sparkman v. Highway Insurance Co., E.D.La.1967, 266 F.Supp. 197, 203. Another general principle of insurance law is that ambiguities in a policy are to be resolved in favor of the insured. See, e. g., Albritton v. Fireman's Fund Insurance Co., 1954, 224 La. 522, 70 So.2d 111, 113; Thompson v. Phenix Insurance Co., 1890, 136 U.S. 287, 297, 10 S.Ct. 1019, 34 L.Ed. 408; Godfrey v. United States Casualty Co., W.D.La.1959, 167 F.Supp. 783, 790. This principle has been stated at times to require a finding for the insured where the insured's interpretation of the policy is "reasonable", notwithstanding other reasonable interpretations favoring the insurer. See Zoller v. State Board of Education, La.App.1973, 278 So.2d 868, 870.[6]
 
 
 19
 Finally, the banks might rely on the principle of insurance law that words are to be construed in their plain, ordinary, and popular sense. See Muse v. Metropolitan Life Insurance Co., 1939, 193 La. 605, 192 So. 72, 75; Floyd v. Pilot Life Insurance Co., La.App.1961,135 So.2d 546, 548; Bergholm v. Peoria Life Insurance Co., 1932, 284 U.S. 489, 492, 52 S.Ct. 230, 76 L.Ed. 416; LSA-R.C.C. Art. 1946.[7] This rule is varied from only if a word is used as a "term of art", in which case its meaning in the area for which it is a term of art is applied. See LSA-C.C. Art. 1947[8]; Reliance Insurance Co. v. Orleans Parish School Board, 5 Cir. 1963, 322 F.2d 803, 806, cert. denied, 377 U.S. 916, 84 S.Ct. 1180, 12 L.Ed.2d 186.
 
 
 20
 In support of the nonapplicability of the loan exclusion clause, it would be argued first that the word "loan", as used in the clause, is ambiguous. The banks would obviously contend that the exclusion refers to a situation in which the lender comes into the bank, negotiates with the loan department, signs a promissory note, and receives from the bank money which must be repaid at interest. We refer to such a transaction as a formal loan. The bonding companies, on the other hand, would argue that "loan", as used in the policy, refers to a transaction in which the bank lends money to a borrower; such a loan may take many forms, only one of which is a formal loan. We refer to this type of transaction as a de facto loan. The banks would then argue that, since the policy does not specify formal loans or de facto loans, the word "loan" is ambiguous and the ambiguity must be construed in the banks' favor. Supporting this position, the banks would argue that the insurer has not clearly expressed its intention to deny coverage to de facto loans, that the insurer has not overcome its burden of proving the exclusion, that the word "loan" means, in the ordinary and popular sense, a formal loan, and that, if the word is to be interpreted as a term of art, it still refers only to a formal loan.
 
 
 21
 The bonding companies would rejoin that the special rules favoring the insured are only applicable when there is an ambiguity. They would argue that the word "loan" is not ambiguous but is intentionally broad, that the contract refers to "any loan", and that the exclusion covers all circumstances in which there has been a de facto loan.
 
 
 22
 The special rules of interpretation do indeed apply only when there is an ambiguity; courts ought not to strain to find such ambiguities, if, in so doing, they defeat probable intentions of the parties. See Monteleone v. American Empire Insurance Co., 1960, 239 La. 773, 120 So.2d 70, 72.[9] This is so even when the result is an apparently harsh consequence to the insured. See State Bank of Poplar Bluff v. Maryland Casualty Co., 8 Cir. 1961, 289 F.2d 544, 547; American Casualty Co. v. Myrick, 5 Cir. 1962, 304 F.2d 179 (by implication).
 
 
 23
 General principles do not always decide particular cases. With that in mind, we attempt to understand the meaning of the term "loan" as used in the policy exclusion. First, we illustrate some of the many situations in which there exists a de facto loan and show that the instant transactions fall into that category.
 
 
 24
 The classic definition of a loan is given in In re Grand Union Co., 2 Cir. 1914, 219 F. 353, 356.
 
 
 25
 A loan of money is a contract by which one delivers a sum of money to another and the latter agrees to return at a future time a sum equivalent to that which he borrows."In order to constitute a loan there must be a contract whereby, in substance one party transfers to the other a sum of money which that other agrees to repay absolutely, together with such additional sums as may be agreed upon for its use. If such be the intent of the parties, the transaction will be considered a loan without regard to its form." (Emphasis added.)
 
 
 26
 This language is used as the definition of a loan in The Michie Co., 6 Banks and Banking, ch. 11, § 1 (1952). G. Munn, Encyclopedia of Banking and Finance (F. Garcia, 6th ed. 1962) defines a loan as "The letting out or renting of sums of money by a lender to a borrower, to be repaid with or without interest". Id. at 421.
 
 
 27
 Repeatedly, it has been observed that a loan may exist regardless of the form of a transaction. C. Sollman, Banks and Banking § 4823 (1936); Williams Deacon and Co. v. Jones, 1884, 77 Ala. 294, 305-06 (by implication). Loans have been found to exist in transactions that were arguably purchases, see In re Grand Union, supra ; Bon Homme County Bank v. Dakota National Bank, 1926, 50 S.D. 191, 208 N.W. 825, 826, and in transactions that were arguably transfers in trust, see Bellevue State Bank v. Coffin, 1912, 22 Idaho 210, 125 P. 816, 818. Loans have been found, for the purpose of usury laws, when a bank advances money and the transaction is "in substance" a loan. See Hudson v. Repton State Bank, 1917, 16 Ala.App. 101, 75 So. 695, 696. Loans, in substance, have been found when the issue is relevant to whether a corporation's actions have been ultra vires, see Watson v. Jackson, Tex.Civ.App.1924, 264 S.W. 603, 610, error dismissed, 268 U.S. 681, 45 S.Ct. 637, 69 L.Ed. 1154; Schramm v. Bank of California National Association, 1933, 143 Or. 546, 20 P.2d 1093, 1096, and when the issue is relevant to the duty of fair dealing of one who receives money, see Bank of the Republic v. Baxter, 1858, 31 Vt. 101, 107. Overdrafts from demand deposit accounts have been thought to constitute loans. See Schramm, supra ; G. Munn, supra, at 563; cf. Bromberg v. Bank of American National Trust and Savings Association, 1943, 58 Cal.App.2d 1, 135 P.2d 689, 692; Prowinsky v. Second National Bank, 1920, 49 U.S.App.D.C. 363, 265 F. 1003; Florida-Patsand Corp. v. Central Bank and Trust Co., Fla.App.1965, 177 So.2d 533, 534.
 
 
 28
 These cases support the proposition, with which we agree, that "whether or not (a) transaction constitutes a loan, is to be determined from the surrounding facts in the particular case". The Michie Co., 6 Banks and Banking, ch. 11, § 4, at 225; Stolze v. Bank of Minnesota, 1897, 67 Minn. 172, 69 N.W. 813, 814. We return now to the facts of the case before us.
 
 
 29
 In both cases, money was advanced to a customer of the bank. The manner in which credit was advanced by the banks is strikingly similar to the transactions called "loans" in Bellevue State Bank, Bon Homme County Bank, Bank of the Republic, and Schramm. Moreover, interest was to be charged in both cases. That the presence or absence of interest is significant was noted by Judge Rubin in National Bank of Commerce, 312 F.Supp. at 75, and, of course, appeals to common sense.[10]
 
 
 30
 In the Calcasieu transaction, the only piece of evidence that suggests there was not a loan is the absence of a promissory note. While a note would certainly be evidence of a loan, it is not a prerequisite for the transaction to be a loan. See, e. g., Merchants' National Bank v. First National Bank, 8 Cir. 1916, 238 F. 502, 507; Zurich General Accident and Liability Insurance Co. v. Safe-T-Kros Drug Co., 1930, 91 Ind.App. 130, 170 N.E. 351, 353; In re Nellis' Will, Sur.Ct.1926, 126 Misc. 638, 214 N.Y.S. 378, 379. There is no distinction of substance between the Grace-Kennedy transaction and many previous transactions at the bank in which a note was signed.[11] With respect to these latter transactions, Calcasieu originally sued the bonding company and the applicability of the loan exclusion clause was conceded; the only remaining question was whether the transaction fell within an exception to the exclusion. The record does not explain why the Grace-Kennedy draft was not taken with a note as other drafts were. Whatever the reason, however, the absence of a note was clearly not intended to change the substance of the underlying transaction.
 
 
 31
 With respect to Louisiana Bank, the transaction looks even more like a loan. Credit was advanced on documents which were not even completed. Moreover, the bank's custom was to take a note along with the draft. The bank president, Ogeron, testified that the Federal Deposit Insurance Corporation recommended taking a note with the drafts.[12] Blank notes bearing Jack Smith's signature as Rex president, but no indication of amount, were taken by the bank with the Connell drafts.
 
 
 32
 Louisiana Bank points out that, although it charged a fee referred to as "interest", that fee was charged to the bank by the American Bank of Baton Rouge (American), and Louisiana Bank was only passing along that charge. American was involved in the transaction, according to Ogeron's testimony, because the Louisiana Bank did not have sufficient loan capacity to advance the appropriate credit to Rex. Because of Louisiana Bank's arrangement with American, however, Louisiana Bank obviously continued to bear the risk of loss. At any rate, that Louisiana Bank made no direct profit from the "service charge" it assessed Rex is not important. Banks often borrow money at one rate and lend it at a higher rate. They profit on such transactions but clearly not as much as the rate at which they loan might suggest. Here, the rate of borrowing and the rate of lending is the same. No immediate profit is obvious. The materiality of this is negligible. If it is necessary to find that Louisiana Bank profited from its transaction, the "profit" was derived from its nurturing of Rex's business. Here, Louisiana Bank nurtured Rex's business too long and too hard.
 
 
 33
 We have shown that the transactions were de facto loans. The final question, then, is whether the policy can be construed to exclude coverage only with respect to formal loans.
 
 
 34
 In Travelers Insurance Co. v. Brown, 5 Cir. 1964, 338 F.2d 229, 237, we observed that, for the purposes of interpreting an insurance contract, the intentions of the parties were paramount. It appears, however, that the parties intended the loan exclusion clause to apply to different things. The bondsmen's intentions were obviously reasonable. The question, then, is whether the banks' expectations of coverage at the time of the agreement were objectively reasonable. See R. Keeton, Insurance Law 351 (1971). We hold that, if the banks expected coverage in this type of transaction, such expectations were not objectively reasonable. First, we repeat that the term "any loan" is broad and is not restricted by any narrowing modifier. The banks should have been aware of the breadth of this term.[13] More importantly, however, the banks are asking, in this instance, for credit insurance: insurance provided against losses from bad debts arising from the sale of goods on credit, coverage for uncollectable accounts. G. Munn, supra, at 170. The banks "sold" their goods in trade, money, to their respective customers, Lake and Rex, with the expectation that the purchase price, with interest, would be repaid in the future.[14] The banks lost their money because the accounts became uncollectable. Under Louisiana law, the banker's blanket bond does not provide credit insurance. See Allen State Bank v. Traveler's Indemnity Co., La.App.1972, 270 So.2d 270, 273. See also First National Bank v. Aetna Casualty and Surety Co., 6 Cir. 1962, 309 F.2d 702, 705, cert. denied, 372 U.S. 953, 83 S.Ct. 951, 9 L.Ed.2d 977. As the Louisiana court said in Allen State Bank, "the bond is not a policy of credit insurance and does not protect the bank when it simply makes a bad business deal".
 
 
 35
 To the same effect are East Gadsden Bank v. United States Fidelity and Guaranty Co., 5 Cir. 1969, 415 F.2d 357, 359-60 and First National Bank and Trust Co. v. Continental Insurance Co., 10 Cir. 1975, 510 F.2d 7, 12-13. In East Gadsden Bank, we affirmed a decision of a district court holding that the loan exclusion clause applied to a transaction in which the borrower, who received funds on the security of construction contracts, misappropriated the payment of contract monies. We observed, "it is plain that the Insurer here did not purport to provide a policy of credit insurance". In First National Bank, the Tenth Circuit held that the purchase of commercial paper by a bank constituted a loan to the automobile dealership from which the paper was purchased. The court observed
 
 
 36
 The important aspect of this case is the fact that for some ten years First National had been financing the . . . dealership by making countless loans, in one form or another. And when the . . . dealership folded, First National was left with unpaid loans. Such loss was an excluded risk.
 
 
 37
 (Emphasis added.)[15]
 
 
 38
 All that remains is to distinguish the instant transaction from the check-kiting cases.[16] The most important distinction is that, when the bank credits a check, it reasonably expects the check to be paid in the normal course of business. See Pioneer Valley Savings Bank v. Indemnity Insurance Co., N.D.Iowa 1964, 225 F.Supp. 404, 411, aff'd, 8 Cir. 1965, 343 F.2d 634. Such an expectation may be reasonable even if the bank knows that there are no funds in the drawee bank to cover the check, because of the depositor's credit at the drawee bank or because of the practice of many banks to honor overdrafts. See id. But, with respect to the drafts deposited with the two banks here, there could have been no reasonable expectations. Although many previous drafts had been paid in the normal course of business, it was always up to the purchaser to honor or dishonor a draft. The difference between checks and drafts is well explained in E. Farnsworth, Commercial Paper 345 (1968):
 
 
 39
 . . . (a collecting bank) will treat the draft as a "collection" item rather than a "cash" item. Checks, the most common items handled by the banks, are dealt with in bulk as "cash" items on the assumption that they will be honored in the overwhelming majority of cases; provisional credits are entered immediately for a check at all states of the collection process and automatically become final without further action upon payment by the drawee bank. . . . Documentary drafts, on the other hand, are handled as "collection" items and dealt with individually, rather than in the bulk, and since no assumption is made that they will be honored, no credits, not even provisional credits, are given until the item has been paid by the buyer.[17]
 
 
 40
 The banks here must have known that there was considerable risk in crediting the drafts before acceptance by the purchaser. The banks took such risks in the hope of making a profit on the interest or in obtaining other business advantages. The insurers, who did not issue policies of credit insurance, did not take those risks and are not to be held accountable now, when the risks have turned bad.[18]
 
 III
 NSF CHECKS
 
 41
 The remaining issue is whether the Louisiana Bank suffered a loss when it paid off stale rough rice drafts after receiving NSF checks drawn on Lake's Calcasieu account and deposited in Rex's Louisiana Bank account. This issue turns, according to Louisiana Bank, on whether the bank was actually liable on the stale drafts. The bank suggests, in its reply brief and in its oral argument, that there is no evidence that the drafts were regular on their faces and, hence, that the bank was, under Louisiana law, actually liable on them. The district court impliedly found that a loss occurred from the deposit of the NSF checks. No mention is made, however, of the defendant's contention that the bank lost no money because it used funds to pay its own debts. We hold that the implicit finding of the district court has no evidentiary support in the record.
 
 
 42
 The answer of the defendant to Louisiana Bank's complaint alleges that "no loss has been suffered by complainant by reason of the issuance of the checks described in the complaint". The pretrial stipulations bear out this allegation. The bank stipulated that: "drafts exemplified by Defendant's Exhibit 19 were drawn on Rex Rice account at Louisiana Bank . . ."; on March 17, 1969 "Louisiana Bank . . . paid $100,518.89 of Rex's outstanding stale drafts and shortly thereafter paid an additional $4,037.94 of stale Rex drafts"; Louisiana Bank records "show that Louisiana Bank . . . failed to accept or to make timely protest or nonacceptance of considerably more than $110,000.00 worth of Rex's rough rice drafts . . . and this made Louisiana Bank . . . liable to the payees on the payment of said drafts"; and "Louisiana Bank . . . did, in fact, accept or concede liability for at least $512,972.37 of similar stale drafts still remaining unpaid after March 17, 1969". Although there is no direct evidence that the drafts paid by Louisiana Bank with the proceeds of the NSF checks were regular on their faces, there is overwhelming indirect evidence to that effect. There is no suggestion in the record of any irregularity of such drafts. There is no suggestion that the exemplary draft, Defendant's Exhibit 19, is irregular. There is no reason to believe that Louisiana Bank, when faced with such a huge loss on stale rough rice drafts, would have paid off any drafts on which it was not liable.[19]
 
 
 43
 The bank's attempt to prove a loss on the theory that it was not actually liable on the drafts that were paid is an attempt to accomplish what it failed to do, or could not do, at trial. Especially in view of the breadth of the pretrial stipulations, it was imperative for Louisiana Bank to produce the drafts it actually paid and to show that it was not liable on such drafts. We therefore hold that Louisiana Bank suffered no loss through its payment of the stale rough rice drafts.
 
 
 44
 In conclusion, we reverse the judgment in both district courts. The bonds did not cover any losses incurred by the plaintiff banks.
 
 
 45
 REVERSED.
 
 
 
 [1]
 Because Jack Smith operated both rice mills, it was not considered unusual for a draft to be deposited for Lake's account, but supported by a Rex invoice. Jack Smith's dual role explains why Grace-Kennedy sent its check to Rex rather than to Lake
 
 
 [2]
 La.R.S. 7:136-37, repealed, eff. Jan. 1, 1975 by Act 92 of 1974
 
 
 [3]
 A check-kiting scheme, of course, is a process whereby a person with a checking account in two banks can create an illusion of money in his accounts. A check drawn on the first bank is deposited with the second bank. Before the check reaches the first bank for payment, a check drawn on the second bank is deposited in the first bank. If the bank is willing to give credit in the interim, and many banks are if the person is a regular customer, the person can use the bank's money without first providing collateral and without paying interest. The scheme can go on as long as the person keeps on depositing checks in both banks and as long as the banks believe that there is money behind the checks
 The analogy between check-kiting and depositing drafts on rice not yet delivered is not exact. In the check-kiting scheme, the depositor usually attempts to keep the kite flying by depositing worthless checks in both banks. In the draft situation, the scheme can continue only so long as the purchaser receives evidence of delivery of the commodity before he must accept or dishonor the draft. The depositor can use the bank's money for a limited period of time; he cannot convince the purchaser to accept the draft by depositing with it a draft drawn on the bank.
 
 
 [4]
 See also Pioneer Valley Savs. Bank v. Indemnity Ins. Co., N.D.Iowa 1964, 225 F.Supp. 404, 410-12, aff'd, 8 Cir. 1965, 343 F.2d 634, 652; United States v. Western Contracting Corp., 8 Cir. 1965, 341 F.2d 383, 390; Fidelity & Cas. Co. v. Bank of Altenberg, 8 Cir. 1954, 216 F.2d 294, 304; Hartford Accident & Indem. Co. v. FDIC, 8 Cir. 1953, 204 F.2d 933, 937. These cases, like National Bank of Commerce, hold that the loan exclusion clause does not apply to losses caused by check-kiting schemes. Not every court that has faced the question, however, has held that the loan exclusion does not apply to a loss resulting from a check-kite. See Citizens Nat'l Bank v. Travelers Indem. Co., M.D.Fla.1967, 296 F.Supp. 300
 
 
 [5]
 Under Klaxon Co. v. Stentor Electric Mfg. Co., 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477, a federal court must, of course, apply the conflicts rules of the state in which the court sits. LSA-R.C.C. Art. 10 provides that the law of the place where the insurance policy is delivered must govern. Harmon v. Lumbermens Mutual Ins. Co., La.App.1964, 164 So.2d 397; Davis v. Insurance Co. of North America, E.D.La.1967, 268 F.Supp. 496, 499. Similarly, Louisiana law applies if the bond is construed as a surety agreement, Lachman v. Block, 1894, 47 La.Ann. 505, 17 So. 153
 
 
 [6]
 One commonly expressed rationale for this rule is that it would be unjust to construe an ambiguous provision in favor of the party that drafted it. See, e. g., First National Bank v. Hartford Fire Insurance Co., 1878, 95 U.S. 673, 678, 24 L.Ed. 563, 565. This rationale may not be applicable here, in view of the fact that the banker's blanket bond being construed was drafted by a joint effort of the American Bankers' Association and the American Surety Association. All parties are, apparently, members of these respective associations, and it would appear, therefore, that each party was equally responsible for the policy language. This is an additional factor supporting the result we reach in this appeal. See Community Federal Savs. & Loan Ass'n v. General Cas. Co., 8 Cir. 1960, 274 F.2d 620, 625, which held that the bond could not be construed to allow coverage for losses resulting from a loan procured by fraud. Community Federal was substantially relied upon in Maryland Cas. Co. v. State Bank & Trust Co., 5 Cir. 1970, 425 F.2d 979, 981-82
 
 
 [7]
 This article provides:
 The words of a contract are to be understood, like those of a law, in the common and usual signification, without attending so much to grammatical rules, as to general and popular use.
 
 
 [8]
 This article provides:
 Terms of art or technical phrases are to be interpreted according to their received meaning with those who profess the art or profession to which they belong.
 
 
 [9]
 See also Hemel v. State Farm Mut. Auto. Ins. Co., 1947, 211 La. 95, 29 So.2d 483, 485; Jennings v. Louisiana & Southern Life Ins. Co., La.App.1973, 280 So.2d 297, 300; Clerk v. Connecticut Fire Ins. Co., La.App.1967, 203 So.2d 866, 868, writ ref., 251 La. 733, 206 So.2d 90; Bowab v. St. Paul Fire and Marine Ins. Co., La.App.1963, 152 So.2d 66, 68, app. denied, 244 La. 664, 153 So.2d 881; Green v. National Bellas Hess Life Ins. Co., La.App.1960, 124 So.2d 397, 398
 
 
 [10]
 In Birmingham Fire Ins. Co. v. Adolph, supra, we were called upon to determine the meaning of the word "employees" for the purposes of an insurance policy exclusion that denied coverage to an employee injured by another employee of the insured partnership. We held that a partner was not an employee within the meaning of the policy exclusion. In so holding, we observed that a relevant consideration would be "whether the partner received wages or other specific compensation in addition to his partnership share of profits". 379 F.2d at 951. One factor supporting our decision was the fact the the $250 per month drawn by the partner involved in the accident depended upon the existence of profits to pay that amount. This made the partner look more like an owner and less like an employee. Birmingham Fire supports the notion that common sense is an appropriate method by which to judge whether a transaction falls within an insurance policy exclusion
 
 
 [11]
 We note that Jack Smith, in his deposition, testified that when he'd present a draft to the bank, he'd "sign a note", secured by the invoice. The sight drafts were used as a method of financing in conjunction with promissory notes. Smith believed that the Grace-Kennedy draft would have had to have been presented with a promissory note
 
 
 [12]
 The purpose of taking notes was probably to protect the bank from certain kinds of loss. Without a note, it might appear that the bank had purchased the sight drafts and the accompanying documents and fully accepted the risk of dishonor
 
 
 [13]
 We reject the argument that there cannot be a loan unless the bank intends to make a "loan". The policy excludes coverage for "any loan made by or obtained from the Insured". (Emphasis added.) The words "or obtained from" are especially significant, for they demonstrate that the exclusion applies to situations in which the intent of the lender is not clear. The contract, of course, must be construed, if possible, so as to give effect to all of its stipulations. See LSA-C.C. Art. 1955; Noel Estate, Inc. v. Kansas City S. & G. Ry., 1937, 187 La. 717, 175 So. 468, 470; Solomon v. Hickman, La.App.1969, 219 So.2d 330, 333. We also reject the statement in National Bank of Commerce, 312 F.Supp. at 75, that "loan" in the exclusion clause refers to a transaction in which the borrower has made an express agreement to repay. As we demonstrate in text, that construction unreasonably narrows a broad provision
 
 
 [14]
 The banks had, perhaps, no more reason to fear nonpayment with respect to the drafts on which they lost money than they had with respect to the many previous drafts that were honored by the purchasers. Under the Paulding reasoning, this alone would take the transaction out of the "loan" category. This reasoning, of course, begs the question. All of the previous transactions could have been, and in fact were, loans themselves. It cannot be thought unusual for a bank customer to make and repay regularly many loans while its business flourishes, but to default on subsequent loans when its business founders
 
 
 [15]
 Two other cases have held that the loan exclusion clause applies to the advance of money on the assignment of receivables evidenced by false invoices. Exchange Nat'l Bank v. Insurance Co. of North America, 2 Cir. 1965, 341 F.2d 673; Capitol Bank v. Fidelity & Cas. Co., 7 Cir. 1969, 414 F.2d 986. These cases suggest that coverage depends, in part, upon the ease with which the bank could verify the lack of the accounts. This would not, of course, explain the result in the check-kiting cases, in which even a cursory attempt at verification would uncover the fraudulent scheme. There is no inconsistency, however, because the cases mentioned above were discussing the applicability of Clause E, which provides some exceptions to the loan exclusion in cases of counterfeiting and forgery. To the extent, however, that the cases deem the loan exclusion applicable in the first instance, they support the position reached in this appeal. To be sure, notes evidencing the loan were signed in these cases. But as we make clear in text, the absence of notes does not preclude us from observing the true nature of the transactions
 
 
 [16]
 We also distinguish Shoals Nat'l Bank v. Home Indem. Co., N.D.Ala.1974, 384 F.Supp. 49, aff'd without opinion, 515 F.2d 1182. There, the district court held that a broader loan exclusion denying coverage for losses due to "any loan or transaction in the nature of, or amounting to, a loan" did not apply to a loss resulting from the advance of money on negotiable sight drafts and checks supported by false invoices. The court relied on Paulding, National Bank of Commerce, In re Grand Union, supra, and on the rule that ambiguities are to be construed against the insurer, see First Nat'l Bank v. Insurance Co. of North America, 7 Cir. 1970, 424 F.2d 312, 317 (rule applies notwithstanding fact that bond was the result of joint effort of the American Bankers Association and the Surety Association of America). Shoals is distinguishable on two grounds: first, the court believed that the loss occurred because the bank's bookkeeping department mistakenly believed that the depositor had money in its account; second, the bond would not have excluded coverage for a loan anyway, because of an exception for transactions within the offices of the insured. See 384 F.Supp. at 53, 55. Even in the absence of these distinguishing characteristics, Shoals would be unpersuasive authority. Our affirmance without opinion is insignificant
 
 
 [17]
 Quoting Farnsworth, Documentary Drafts Under the Uniform Commercial Code, 22 Bus.Law. 479, 482 (1967). Although Art. 4 of the U.C.C. was not in force in Louisiana at the time of the transactions with which we are concerned, Farnsworth's observations are not legal observations but practical observations. In any event, there does not appear to be any relevant difference between the old Negotiable Instruments Law and the U.C.C
 
 
 [18]
 We are confident that our construction of the bonds has not "trapped" the banks in the sense of their being victimized by a ruling that they could not have expected. See Williams v. Union Central Life Ins. Co., 1934, 291 U.S. 170, 180, 54 S.Ct. 348, 78 L.Ed. 711; Hemel v. State Farm Mut. Auto. Ins. Co., 1947, 211 La. 95, 29 So.2d 483, 486
 
 
 [19]
 By way of suggesting that it might not have been liable on the drafts paid on March 17, 1969, Louisiana Bank cites Bollich v. Louisiana Bank & Trust Co., La.App., 1972, 271 So.2d 274. There Louisiana Bank was relieved of liability on a draft presented twice, on March 17 and March 19. Each time the draft was returned without payment within the 24-hour period. Even if this case supported, which it does not, the bank's contention that it might not have been liable on the drafts paid on March 17, the case does not appear to have been presented as evidence in the trial court